Stanley ROBINSON and the Estate of Bobby Shine, Plaintiffs–Appellants,

v.

CATTARAUGUS COUNTY and Jerry E. Burrell, Individually and in his capacity as Sheriff of Cattaraugus County, Defendants,

Robert Edenhofer and Sergeant Nichols, Individually and as officers of the Cattaraugus County Sheriff's Department, Defendants–Appellees.

Docket No. 97–7354.

United States Court of Appeals, Second Circuit.

Argued Jan. 5, 1998.

Decided June 10, 1998.

**156**

Nira T. Kermisch, Rochester, NY, for Plaintiffs–Appellants.

Maryjo C. Falcone, Buffalo, NY (Damon & Morey, Buffalo, NY, on brief), for Defendants–Appellees.

Before: KEARSE and JACOBS, Circuit Judges, and ARTERTON, District Judge[*].

KEARSE, Circuit Judge:

Plaintiffs Stanley Robinson and the Estate of Bobby Shine (Shine and his estate referred to interchangeably as a "plaintiff") appeal from so much of a final judgment, entered in the United States District Court for the Western District of New York following a jury trial before John T. Curtin, *Judge,* as denied their motion for a new trial as to (a) damages for the violation of their Fourth Amendment rights by defendants Robert Edenhofer and Sergeant Nichols, and (b) Shine's claim against those defendants for malicious prosecution. The jury found that Edenhofer and Nichols had violated the Fourth Amendment rights of both plaintiffs; as compensatory damages for those violations, it awarded a total of $30,000 to the estate of Shine but no damages to Robinson; the district court awarded Robinson nominal damages totaling $2. The jury awarded no punitive damages, and it found that Shine had not proven his claim of malicious prosecution. On appeal, plaintiffs contend that they are entitled to a new trial on damages and on Shine's claim for malicious prosecution, arguing principally (1) that the jury's denials (a) of any compensatory damages to Robinson, (b) of more than $30,000 in compensatory damages to Shine, and (c) of punitive damages to either plaintiff, were against the weight of the evidence; and (2) that the trial court gave erroneous instructions on

damages and on malicious prosecution. Finding no basis for reversal, we affirm.

## I. BACKGROUND

The present action centers principally on events that occurred in 1988–1989 in the village of Wellsville, a town of about 3,000 in Allegany County in western New York State. The evidence presented at trial included the following.

### A. *The Undercover Operation and the Pressures on Plaintiffs*

Sometime in 1988, the Wellsville police department believed there was narcotics trafficking in the village. Because Wellsville was small, and most of the residents knew each other, the village police department enlisted the aid of the nearby Cattaraugus County sheriff's department to carry on an undercover investigation. Edenhofer and Nichols (collectively the "officers") were members of the Cattaraugus County sheriff's department who were selected to work in Wellsville undercover. The officers proceeded to visit Wellsville several times a month, frequenting a pub called PJ's and apparently consuming large quantities of alcohol, attempting to find persons who would sell them drugs.

In 1988, Wellsville had three black residents, including Robinson and Shine. Robinson was introduced to Edenhofer and Nichols at PJ's in October or November of 1988. Edenhofer said he and Nichols wanted to buy cocaine, and he asked whether Robinson had any or knew where they could get some. Robinson, who was a sometime-user of cocaine, responded that he had none and did not know a source. Edenhofer bought Robinson several beers and persisted in asking him about cocaine. Finally, Robinson spoke to a woman in the bar who undertook to find a supplier; she eventually arranged to have the buyers meet her at her home. Edenhofer persuaded Robinson to go with them and to enter the woman's house to get the cocaine, pay for it with money supplied by Edenhofer, and promptly hand it over to

[*] Honorable Janet Bond Arterton, of the United States District Court for the District of Connecti-
cut, sitting by designation.

Edenhofer who remained outside. Robinson did not obtain any cocaine for himself on that occasion and had no financial stake in the transaction.

For the rest of the fall, Edenhofer and Nichols asked Robinson for drugs every time they saw him, until, in December, Robinson became exasperated:

> Edenhofer and Nichols came into the bar, and Edenhofer comes up to me and says, Stan, can you get me some cocaine, you got any cocaine you can sell to me. I told him, no, I didn't have any cocaine, I didn't know where any was at. He says, ah, c'mon, Stan, c'mon man, I want to score, I'll make it worth your while, you know. And I— this man is asking me every time from the time—from the first time to up to December every Thursday or Friday night. I would see him in the bar and he would ask me the same thing. I would tell him, no, no. And I was just tired of him just coming up and harassing me about drugs like just because I'm black I'm supposed to know where drugs are at or I was selling drugs, which I wasn't. And I decided that, you know, I was going to beat him.

(Trial Transcript ("Tr.") 91.) Robinson proceeded to go home, fill a plastic baggie with sugar, and sell it to Edenhofer for $200.

The next time Robinson saw Edenhofer was in the wee hours of January 21, 1989. Edenhofer and Nichols had spent the evening of January 20 at PJ's, drinking with a number of village residents including one Jeffrey Lee Voorhees. Late in the evening, Edenhofer asked Voorhees where Robinson lived. According to Voorhees, after he gave Edenhofer that information, Edenhofer "said that Stan [Robinson] had ripped them off and they were going to teach that nigger a lesson." (Tr. 187.) Edenhofer "patted his side and said that he had something that would teach that nigger a lesson." (*Id.*) Edenhofer and Nichols left the bar. Voorhees, who did not then know that they were police officers (they had represented themselves to Voorhees as car thieves), wanted to warn Robinson, but Robinson did not have a telephone. Voorhees therefore drove to Robinson's house; he arrived just in time to see the officers enter the house, one of them brand-ishing a gun, and heard a great deal of "commotion" emanating from inside the house thereafter.

Inside the house were Robinson and Shine, who were awaiting the arrival of friends with whom they were to go to a party. Once the officers were inside the house, they held Robinson and Shine at gunpoint, searched the house, searched both occupants thoroughly, and took $75 and two bags of cocaine from the pocket of Shine. Edenhofer and Nichols repeatedly stated that they had been ripped off, demanded more money or cocaine, and threatened to "blow away" various of Robinson's and Shine's body parts. Edenhofer and Nichols eventually left, but only after the friends whom Robinson and Shine had been expecting arrived and, though initially sent away, returned minutes later. At no time during these events did Edenhofer and Nichols produce search warrants or identify themselves as law enforcement officers.

B. *The Criminal Charges Against Robinson and Shine*

In June 1989, Robinson and Shine were arrested on charges of possession and sale of narcotics, based on the events of the prior fall and winter. The charges against Robinson were based on the fall 1988 occasion on which he entered the home of the woman from the bar and exchanged the money provided to him by Edenhofer for the cocaine that he promptly turned over to Edenhofer. Robinson pleaded guilty to the possession count. At trial in the present action, he explained,

> I felt that I didn't have any other choice but to plead guilty because I did have the cocaine in my possession for about five minutes, and I didn't have any knowledge of anything else to do, you know, because I did have it in my possession, although I didn't sell it.

(Tr. 90.) As a result of his plea of guilty, Robinson served two years in prison.

The sale and possession charges against Shine were based on the cocaine the officers took from him in the early morning hours of January 21, 1989. Shine, who when arrested

in June 1989 was on bail in connection with an unrelated arrest, pleaded not guilty and was returned to jail on the cocaine charges, where he remained for several months before he was able to raise new bail. Following a bench trial, he was found guilty. In November 1992, however, his conviction was reversed by the Appellate Division on the ground that the conduct of Edenhofer and Nichols constituted "sheer lawlessness," "egregious" misconduct, and "conduct repugnant to a sense of justice":

> The charges arose on January 21, 1989, when, at about 2:00 A.M., two undercover police officers went to the home of one Stanley Robinson to confront him because one month earlier he had sold them powdered sugar instead of cocaine. The officers, who had been drinking beer in a local bar for hours, knocked on the door of Robinson's home and demanded entry. Once inside, they accused Robinson and defendant, who was also present, of having "ripped them off". The officers demanded money or drugs. The officers admitted that one of them displayed a loaded gun during the early stages of the encounter. Eventually, defendant offered the officers $50 and a gram of cocaine to make things even. Defendant pulled money and a small package of cocaine from his pocket and handed them to the officers. Defendant was charged with third degree criminal sale and possession of a controlled substance as a result of that incident.

> County Court denied defendant's motion to dismiss the indictment on the ground that his right to due process had been violated by police misconduct. We reverse and grant the motion.

> . . . [I]n some instances, police conduct, "when tested by due process standards", can be "so egregious and deprivative as to impose upon us an obligation to dismiss". . . . Even if defendant fails to prove entrapment because he was predisposed to commit the crime, dismissal may be warranted "[t]o prevent improper and unwarranted police solicitation of crime". . . . The Court [of Appeals has]

set forth four factors to be considered when evaluating a due process claim: 1) whether the police manufactured a crime which otherwise would not likely have occurred, or merely involved themselves in ongoing criminal activity; 2) whether the police themselves engaged in criminal or improper conduct repugnant to a sense of justice; 3) whether defendant's reluctance to commit the crime is overcome by appeals to humanitarian instincts, such as sympathy or past friendship, by temptation of exorbitant gain, or by persistent solicitation in the face of unwillingness; and 4) whether the record reveals simply a desire to obtain a conviction rather than to prevent further crime or protect the populace (*People v. Isaacson*, [44 N.Y.2d 511, 518–21, 406 N.Y.S.2d 714, 717–19, 378 N.E.2d 78 (1978)] ).

> We conclude that this is one of those rare cases where the conduct of the police, measured against the factors set forth in *People v. Isaacson* (*supra*) deprived defendant of due process. There can be no dispute that the officers manufactured this crime by going to Robinson's home in the middle of the night demanding drugs. Defendant did not seek out the officers to sell drugs to them and the meager evidence that defendant may have been involved in the prior sale to the officers of powdered sugar rather than cocaine hardly supports a finding of "ongoing criminal activity". More importantly, the officers engaged in "criminal or improper conduct repugnant to a sense of justice". . . . The actions of the officers, demanding entry to a person's home in the middle of the night, displaying a gun and demanding drugs, are not justified by the fact that the officers were working undercover. By engaging in such violent and intimidating conduct, the officers crossed the threshold into "sheer lawlessness" and demonstrated their desire to obtain a conviction above all else. Defendant's handing over cocaine was obviously coerced by egregious police misconduct. To allow this prosecution to stand would mock "that fundamental fairness essential to the very concept of justice". . . .

*People v. Shine,* 187 A.D.2d 950, 951, 590 N.Y.S.2d 965, 965–66 (4th Dep't 1992). The Appellate Division reversed Shine's conviction and ordered that the indictment against him be dismissed.

## C. *The Present Action and the Jury's Verdict*

Plaintiffs brought the present action under 42 U.S.C. § 1983 (1994) in 1991; they filed a supplemental complaint following the 1992 reversal of Shine's conviction. To the extent pertinent to this appeal, plaintiffs alleged principally that on January 21, 1989, Edenhofer and Nichols had terrorized them and searched them without probable cause, in violation of their rights under the Fourth Amendment; in addition, Shine asserted a claim of malicious prosecution. Plaintiffs sought several million dollars in compensatory and punitive damages. Following discovery, the case was tried before a jury. The trial witnesses included Robinson, Edenhofer, and Nichols. By the time of trial, Shine had died; parts of his deposition testimony were introduced, and his common-law wife, Susan Winkley, testified to the emotional distress Shine had suffered as a result of the events of January 21 and the subsequent prosecution.

The court furnished the jury with a verdict form that posed separate questions as to the liability of each defendant to each plaintiff on each cause of action, and as to compensatory and punitive damages. The jury was instructed, *inter alia,* that if it found for either plaintiff on the question of liability as to either defendant, it could award that plaintiff compensation

> for any bodily injury or resulting pain, suffering disability, mental anguish or loss of capacity for the enjoyment of life experienced by that plaintiff.... It is up to you to determine what would fairly compensate either plaintiff for the damages he may have suffered.... In a case such as this there may be a finding that there was a violation of constitutional right, but the plaintiff suffered no damage. In such case an award of nominal damages, even in the amount of one dollar, may be made.

(Tr. 1054–55.) The court also instructed that the jury could award either plaintiff punitive damages if, but only if, it awarded that plaintiff "actual or compensatory damages." (Tr. 1056, 1057.)

The jury found, to the extent pertinent to this appeal, that Edenhofer and Nichols violated the constitutional rights of Robinson and Shine on January 21, 1989, and that neither Edenhofer nor Nichols was entitled to qualified immunity with respect to those violations. As to compensatory damages for those violations, the jury found that Shine's estate was entitled to recover $20,000 from Edenhofer and $10,000 from Nichols; but it found that Robinson was not entitled to such damages from either defendant. The jury found that neither plaintiff should be awarded punitive damages, and it found that Shine had not proven his claim for malicious prosecution.

Plaintiffs moved for a new trial on the issues of damages and on Shine's claim of malicious prosecution. They contended, *inter alia,* that the denial of damages to Robinson and the low award to Shine were against the weight of the evidence and were the result of erroneous, confusing, or disobeyed instructions, and of improperly admitted evidence. The district court denied the motion. Judgment was eventually entered awarding Shine compensatory damages as found by the jury, ordering Edenhofer and Nichols each to pay Robinson $1 in nominal damages, and dismissing plaintiffs' other claims. This appeal followed.

## II. DISCUSSION

On appeal, plaintiffs contend principally (1) that the jury's findings as to damages and its rejection of Shine's claim for malicious prosecution were against the weight of the evidence; (2) that a supplemental instruction given by the court on punitive damages was improper; and (3) that instructions and evidentiary rulings with respect to Shine's malicious prosecution claim were erroneous. They also contend that they were denied a fair trial by the admission of evidence as to the cause of Shine's death and by various trial procedures. For the reasons that follow, plaintiffs' first contention is not a proper

ground for appeal, and their remaining contentions provide no basis for reversal.

## A. The Weight of the Evidence as to Damages

■ Plaintiffs' principal contention on this appeal is that they are entitled to a new trial as to damages because they presented evidence as to their emotional distress resulting from the officers' conduct on January 21, 1989, and the jury's failure to award Robinson any compensatory damages and its failure to award Shine more than $30,000 in such damages were "against the weight of the evidence." (Plaintiffs' brief on appeal at 13, 14, 15, 16.) For example, they argue that there was "ample evidence that the two Plaintiffs were detained in the house, were terrorized, and Robinson should have been compensated for such detention. By awarding him no damages, the jury acted improperly, against the weight of the evidence, and a new trial on the issue of damages should be granted[ ] as to Stanley Robinson." (Id. at 13.) Similarly, inferring from a question asked by the jury during its deliberations (see Part II.B. below) that the award of $30,000 to Shine was designed to reimburse him only for the cost of attorneys' fees in defending the eventually reversed criminal prosecution, plaintiffs argue that the jury

> should have awarded [Shine] sufficient monies to compensate him for his pain and suffering, and for the period of his incarceration. As they did not, the award is inadequate, and against the weight of the evidence, and a new trial should have been granted.

(Id. at 14.) Plaintiffs also contend that "[t]here is no question that the conduct of the officers was so egregious and so shocking to the conscience, that punitive damages should have been awarded in this case. Because no punitive damages were awarded, a new trial should have been granted by the District Court...." (Id. at 11.)

■ These arguments, however, are not a proper basis for appeal, for the district court's denial of a new trial on the ground that the jury's verdict was against the weight of the evidence is not reviewable on appeal. See, e.g., Haywood v. Koehler, 78 F.3d 101,

104 (2d Cir.1996); Stonewall Ins. Co. v. Asbestos Claims Management Corp., 73 F.3d 1178, 1199 & n. 13 (1995), modified on other grounds, 85 F.3d 49 (2d Cir.1996). Further, the weight of the evidence is itself a jury argument, not a ground for reversal on appeal. See, e.g., Schwartz v. Capital Liquidators, Inc., 984 F.2d 53, 54 (2d Cir.1993) (per curiam).

■ To the extent that plaintiffs mean to argue instead that they should have a new trial on damages because the jury's answers to the special verdict questions were inconsistent (see, e.g., Plaintiffs' brief on appeal at 12 ("[o]nce the jury determined that Defendants entered the home illegally, and accepted the versions of the events as portrayed by the Plaintiffs, they [sic] should have awarded compensatory damages to the Plaintiffs" for the emotional distress to which plaintiffs testified)), we disagree. When an appellant contends that the jury's answers are inconsistent, our responsibility as a reviewing court is to adopt a view of the case, if there is one, that resolves any seeming inconsistency. See, e.g., Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd., 369 U.S. 355, 364, 82 S.Ct. 780, 7 L.Ed.2d 798 (1962); Fiacco v. City of Rensselaer, 783 F.2d 319, 325 (2d Cir.1986), cert. denied, 480 U.S. 922, 107 S.Ct. 1384, 94 L.Ed.2d 698 (1987). In seeking consistency, we bear in mind that a jury is entitled to believe some parts, and to disbelieve other parts, of the testimony of any given witness. See, e.g., id.; United States v. Gleason, 616 F.2d 2, 15 (2d Cir. 1979), cert. denied, 444 U.S. 1082, 100 S.Ct. 1037, 62 L.Ed.2d 767 (1980). Here, the fact that the jury credited plaintiffs' accounts of the officers' invasion of Robinson's home in January 1989 did not require it to believe plaintiffs' evidence as to either the fact or the extent of their emotional suffering. We thus see no inconsistency.

## B. The Instructions on Nominal and Punitive Damages

Plaintiffs also contend that they are entitled to a new trial as to punitive damages on the ground that a supplemental instruction to the jury was flawed. The supplemental instruction was given in response to the second

of two questions sent by the jury during its deliberations: (1) "can we know how much Bobby Shine paid for his defense of the events of January 21st, 1989"; (2) "if we do not award compensatory damages can we award punitive damages" (Tr. 1087–88). In response to the first question, the court told the jury, apparently without soliciting suggestions from counsel, that the amount Shine had paid was in evidence and the jury should rely on its recollection and on its good judgment.

■ As to the question of whether the jury could award punitive damages if it did not award compensatory damages, we note that the original instruction, as well as the verdict form, erred in indicating that compensatory damages were a prerequisite to punitive damages. We have long recognized in § 1983 cases that punitive damages may be awarded even in the absence of a compensatory award. *See, e.g., King v. Macri,* 993 F.2d 294, 298 (2d Cir.1993); *Stolberg v. Members of Board of Trustees,* 474 F.2d 485, 489 (2d Cir.1973) (dictum). That error was not repeated in the supplemental instructions, however, as the court answered the jury's question, in pertinent part, as follows:

the law is—the Supreme Court has expressed the law that there are circumstances where a jury can find that there has been violation of a person's constitutional right, but then under the circumstances they find that there is no compensatory damage, that is, there is no pain and suffering, there is no lost wages, there are no other elements of any compensatory damage. In that case the Supreme Court says that it is proper to make an award of nominal damage, usually in the amount of one dollar. And if there is a finding of liability, *if* there is a finding that there should be an award of nominal damage, even if there are no additional compensatory damages found, then the jury may go to consider whether or not punitive damages should be awarded under the circumstances. So that I think answers the questions which you put to the Court. . . .

(Tr. 1088 (emphasis added).) After the jury was excused following this instruction, plaintiffs' counsel stated as follows:

I have two objections which I want to put on the record. One, the jury asked to hear some testimony and you did not give them this opportunity regarding the amount paid. I think they should have had the opportunity to hear the testimony of Miss Winkley as it referred to that amount. I also object to the Court keep telling them when they asked, how much was it, to tell them, well, you have to think whether you want to pay. You keep telling them that they have to think about it when they have already thought about it, which indicates to them that you don't think that they should return a damage award. That is very prejudicial in my opinion.

(*Id.* 1090.)

■ Plaintiffs stated no other objection on the matter of punitive damages, and on this appeal their main objection to the supplemental instruction is that the jury's question indicated its desire to award punitive damages and that the supplemental instruction dissuaded the jury from doing so (*see, e.g.,* Plaintiffs' brief on appeal at 10 (supplemental charge "was confusing and, clearly implied to the jury that they should not award punitive damages either to Robinson or Shine, in this case")). We reject this contention, and although we note that there were other errors in both the supplemental instruction and the original charge, we conclude, as discussed below, that those errors were harmless.

Plaintiffs' contention that the supplemental instruction dissuaded the jury from awarding punitive damages is based in part on their assumption that the jury's second question showed "that the jury intended to award punitive damages in favor of at least one of the plaintiffs" (*id.* at 9). A jury verdict, however, in the absence of stipulation by the parties, must be unanimous, *see* Fed.R.Civ.P. 48, and plaintiffs' assumption that the jury had unanimously decided that it wished to award punitive damages is speculative. Plaintiffs' challenge to the supplemental instruction is also based in part on their view that the framing of the supplemental instruction in conditional terms "implied to the jury that they should not award punitive damages" (Plaintiffs' brief on appeal at 10). We see no error. Before the jury has returned

any verdict, it is proper for the court to describe the sequential steps of deliberation in hypothetical terms. We see no indication in the supplemental instruction, which is quoted above, that the court conveyed a suggestion that the jury should not award punitive damages.

 There is one part of the supplemental instruction, however, that was erroneous though not mentioned in plaintiffs' objection. Indeed, the same error was made in the court's original instructions, and was unobjected-to at that time as well. If a jury finds that a constitutional violation has been proven but that the plaintiff has not shown injury sufficient to warrant an award of compensatory damages, the plaintiff is entitled to an award of at least nominal damages as a matter of law. *See, e.g., Carey v. Piphus,* 435 U.S. 247, 266–67, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978); *LeBlanc–Sternberg v. Fletcher,* 67 F.3d 412, 431 (2d Cir.1995), *cert. denied,* 518 U.S. 1017, 116 S.Ct. 2546, 135 L.Ed.2d 1067 (1996); *Gibeau v. Nellis,* 18 F.3d 107, 110 (2d Cir.1994); *McKenna v. Peekskill Housing Authority,* 647 F.2d 332, 335–36 (2d Cir.1981). The jury should be so instructed, and we have held that it is plain error to instruct the jury merely that, having found a violation, it "may" award nominal damages. *See, e.g., LeBlanc–Sternberg v. Fletcher,* 67 F.3d at 431; *Gibeau v. Nellis,* 18 F.3d at 110–11. *See also Abou–Khadra v. Mahshie,* 4 F.3d 1071, 1078 (2d Cir.1993); *Air et Chaleur, S.A. v. Janeway,* 757 F.2d 489, 494 (2d Cir.1985) (unobjected-to instruction is unreviewable, *see* Fed.R.Civ.P. 51, except for plain error).

Here, both the original and the supplemental instructions contained such an error. In its original charge, the district court instructed the jury that if it found a constitutional violation but no injury, "an award of nominal damages, even in the amount of one dollar, *may* be made." (Tr. 1055 (emphasis added).) In responding to the jury's question, the court incorporated this error in the supplemental charge by stating that if the jury found a constitutional violation but no basis for compensatory damages, it could consider awarding punitive damages "if" it found there should be an award of nominal

damages. Both the original and the supplemental instructions thus suggested that if a constitutional violation but no injury were established, the jury had unfettered discretion either to award nominal damages or to withhold them. In failing to inform the jury that if it found a constitutional violation established the jury must award at least nominal damages, the instructions contained plain error.

 An appropriate remedy for that error, however, is for the court itself to enter judgment awarding the claimant nominal damages. *See, e.g., LeBlanc–Sternberg v. Fletcher,* 67 F.3d at 431; *Gibeau v. Nellis,* 18 F.3d at 111. Although the Seventh Amendment generally prohibits a court from augmenting a jury's award of damages, *see* U.S. Const. amend. VII ("no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law"); *Dimick v. Schiedt,* 293 U.S. 474, 486, 55 S.Ct. 296, 79 L.Ed. 603 (1935), that proscription is not violated by the court's entering judgment awarding nominal damages when the jury has failed or refused to do so and the claimant is entitled to such damages as a matter of law. *See, e.g., Gibeau v. Nellis,* 18 F.3d at 111 ("[b]ecause nominal damages are mandatory under these circumstances, our [remand for entry of judgment awarding such damages without a new trial] does not impermissibly invade the province of the jury"). In the present case, the court eventually entered judgment ordering Edenhofer and Nichols each to pay Robinson $1.00 as nominal damages. Thus, the plain error in the instructions as to the requirement for an award of at least nominal damages was cured.

 We must consider also, however, whether plaintiffs were harmed by the incorporation of that error in the supplemental instruction as to punitive damages, for the erroneous indication that punitive damages were not available unless the jury elected to award nominal damages was not cured by having the court itself simply enter a judgment for nominal damages. We conclude that in this case the embedding of the nominal damages error in the supplemental in-

struction on punitive damages must be considered harmless. There was no suggestion whatever that an award of nominal damages was not permitted, and it beggars the imagination to suppose that the jury, if indeed it wished to award punitive damages, would have been deterred from so doing by the supposed requirement that it first exercise its discretion to award $1 in nominal damages.

### C. *Shine's Claim of Malicious Prosecution*

 In order to prevail on a claim of malicious prosecution, a plaintiff must show that the civil defendant initiated or caused the institution of proceedings against the plaintiff without probable cause, that the proceedings were commenced against him with malice on the part of the civil defendant, and that those proceedings terminated in the plaintiff's favor. *See, e.g., Russell v. Smith,* 68 F.3d 33, 36 (2d Cir.1995); *Broughton v. State,* 37 N.Y.2d 451, 457, 373 N.Y.S.2d 87, 94, 335 N.E.2d 310, *cert. denied,* 423 U.S. 929, 96 S.Ct. 277, 46 L.Ed.2d 257 (1975). In arguing that a new trial should be held on Shine's malicious-prosecution claim, plaintiffs contend principally (1) that the district court improperly instructed the jury "that the Grand Jury indictment of the Plaintiff, Bobby Shine, constituted probable [c]ause," and (2) that plaintiffs should have been allowed to introduce into evidence the Appellate Division's opinion as proof of the absence of probable cause. (Plaintiffs' brief on appeal at 19.) We reject both contentions.

Plaintiffs' assertion that the trial court instructed the jury that the indictment "constituted probable cause" (*id.*) is not accompanied by any citation to the record. So far as we are aware, the court, in instructing the jury on the absence-of-probable-cause element of a claim of malicious prosecution, stated as follows:

> If you find that defendant commenced the criminal proceeding you must then find that there was no probable cause to do so. The fact that the evidence against Mr. Shine was presented to a Grand Jury and that the Grand Jury returned indictment is evidence that the prosecution had probable cause to believe plaintiff was guilty. In

order to counter this evidence and establish that there was no probable cause to believe Mr. Shine was guilty the plaintiff must establish that defendant did not make a full and complete statement of fact to either the Grand Jury or the District Attorney, that defendant misrepresented or falsified evidence or else kept back evidence that would have affected the result of the investigation.

(Tr. 1045–46.) Thus, the court informed the jury that the indictment was "evidence" of probable cause, which could be rebutted by, *inter alia,* proof that the officers had misrepresented or concealed material evidence. We see no indication that the court told the jury that the indictment created a conclusive presumption of probable cause, or that this jury was not free to draw its own conclusions from the evidence before it as to the officers' conduct. Further, the jury was informed that Shine's conviction had been reversed on appeal.

 We also reject plaintiffs' contention that, in addition to informing the jury of that reversal, the trial court should have allowed the jury to read the Appellate Division's opinion on the ground that that opinion "held, in a blistering language that there was no probable cause to [*sic*] the entry into the home of Stanley Robinson" (Plaintiffs' brief on appeal at 19; *see also* Tr. 945 (argument of plaintiffs' counsel that "the Appellate Division made an affirmative finding that at the time that the matter was presented to the Grand Jury there was no probable cause because the Deputies manufactured the crime")). First, even assuming that it would not generally be inappropriate to give the jury the text of a judicial opinion, *but see United States v. McCormack,* 829 F.2d 322, 326 (2d Cir.1987) (opinion of Kearse, J.), the Appellate Division's opinion did not in fact address the question of whether the grand jury had probable cause to indict. While that court stated that Edenhofer and Nichols had manufactured the crime by going to Robinson's house in the middle of the night and demanding drugs, which the court characterized as "sheer lawlessness," *People v. Shine,* 187 A.D.2d at 951, 590 N.Y.S.2d at 966, and "criminal or improper conduct re-

pugnant to a sense of justice," *id.* (internal quotation marks omitted), the court relied on principles of due process, not an absence of probable cause.

 Further, even had the state court ruled that there was "no probable cause to [*sic*] *the entry* into the home of Stanley Robinson" (Plaintiffs' brief on appeal at 19 (emphasis added)), that would not constitute a ruling that the grand jury had no probable cause to indict. A prosecution begun after an unconstitutional entry, search, or seizure is not necessarily dismissed upon the suppression of the evidence unlawfully seized, and the presentation to a grand jury of evidence that would be inadmissible at trial is not per se prohibited, so long as the reliance on such evidence is not so extensive as to mislead the grand jury as to the strength of the case, *see, e.g., United States v. Estepa,* 471 F.2d 1132, 1137 (2d Cir.1972). In the present case, James Cicirello, the Wellsville chief of police who had been the village's investigator in the 1988 undercover operation, testified that the information filed against Shine by the village was based on facts in addition to those provided by Edenhofer and Nichols. (*See* Tr. 808; *see also* Tr. 918 statement of plaintiffs' attorney: "What we know is that Cicirello said that he signed [the] information based *in part* on the report submitted by Edenhofer and Nichols." (emphasis added).) Accordingly, in rejecting plaintiffs' request that the Appellate Division's opinion be received in evidence, the district court properly noted that the trial record in the present case did not reveal what other evidence may have been presented to the grand jury and whether that other evidence would have sufficed to show probable cause to indict. We see no error in the district court's refusal to allow plaintiffs to introduce the text of the Appellate Division decision into evidence. It sufficed that the court instructed the jury that Shine's conviction had been reversed.

## D. *Other Arguments*

 Plaintiffs also argue that the district court improperly admitted in evidence Shine's death certificate, which stated that the cause of his death was an apparent over-dose of drugs, and that they were denied a fair trial by the court's peremptory rejection of many of their attorney's arguments and by the court's conduct of a number of *ex parte* communications with defense counsel. We find no basis for reversal.

 Although we are skeptical as to the relevance of the death certificate, we see no prejudicial error. An erroneous admission of extraneous evidence is not a ground for reversal where there is no indication that "the minds of the jurors [were] so influenced ... that they would not appraise the evidence objectively and dispassionately." *United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 239, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); *see also Martell v. Boardwalk Enterprises, Inc.,* 748 F.2d 740, 747 (2d Cir.1984). Shine himself had testified at his deposition that he used cocaine, and we see no likelihood that the jury's objectivity as to his claims against these defendants would have been affected by the admission of an opinion that he died from a drug overdose. Indeed, it did not prevent the jury from finding in his favor on his constitutional claim and from awarding him $30,000 in damages.

 As for plaintiffs' claim that various court procedures denied them a fair trial, plaintiffs have cited us to but a single page in the transcript. That page indicates that the court held an *ex parte* conference with defense counsel in order to rule on whether certain questions would be allowed in cross-examining one of plaintiffs' witnesses. Defense counsel asked to show the court the evidence underlying the proposed questions "[o]utside the presence of Ms. Kermisch [plaintiffs' attorney] because this is obviously cross-examination material," to which the court responded, "Right. I agree," and informed plaintiffs' counsel, "We'll step into chambers. She wants to show me the cross-examination material and I think she is entitled to do that." (Tr. 316.) The basis on which the court believed defense counsel was entitled to this procedure is not clear. Plainly it was appropriate, in advance of the questioning, not to reveal the material to the witness; and if there were to be a recess between discussing the evidence *in camera* or in a sidebar and posing the questions to

the witness, plaintiffs' counsel could properly be instructed not to discuss the matter with the witness. But we see no suggestion in the record that the cross-examination material was confidential, and we are not aware of an appropriate basis for the court to conduct its review in the absence of plaintiffs' counsel. Nonetheless, we see no indication that this incident denied plaintiffs a fair trial.

Aside from this occurrence, plaintiffs' assertions of improper procedure are entirely conclusory and made without any citation whatever to the record. We decline to address them.

## CONCLUSION

We have considered all of plaintiffs' arguments that are properly before us on this appeal and have found in them no basis for reversal. The judgment of the district court is affirmed.

No costs.