**Bobby JAMES,**

v.

**Larry TILGHMAN, et al.**

**No. 2:91 CV 1136 JGM.**

United States District Court,
D. Connecticut.

Nov. 4, 1999.

J.L. Pottenger, Jr., Brett Dignam, Jerome N. Frank Legal Services Organization, New Haven, CT, Bobby Jones, C.C.I., Somers, CT, pre se, Norman A. Pattis, Williams & Pattis, New Haven, CT, for plaintiff.

Steven R. Strom, Stephen J. O'Neill, Robert F. Vacchelli, Richard T. Couture, Attorney General's Office, Public Safety & Special Revenue, Hartford, CT, for defendants.

*RULING ON POST–TRIAL MOTIONS*

MARGOLIS, United States Magistrate Judge.

The factual and procedural history behind this litigation is set forth in considerable detail in *James v. Tilghman,* 2:91 CV 1136(JGM), 1998 WL 849393 (D.Conn. Nov. 5, 1998) ["November 5th Ruling"]. Familiarity is presumed with the numerous pretrial rulings issued in this hotly litigated lawsuit, including: Ruling on Defendants' Motion to Preclude Inmate Informant Identities and on Plaintiff's Motion to Compel Discovery of Inmate Identities and Document Withheld under Assertion of Privilege, filed March 29, 1999 (Dkt. #171) ["March 29th Ruling"]; Ruling on Plaintiff's Motion to Preclude/Limit Testimony, filed April 12, 1999 (Dkt. #183) ["April 12th Ruling"]; Ruling on Defendants' Motion *in Limine,* filed April 13, 1999 (Dkt. #184) ["April 13th Ruling"]; Ruling Following *in Camera* Review of Videotape Deposition of Mr. Y, filed April 22, 1999 (Dkt. #205); and Ruling on Defendants' Motion *in Limine* to Preclude Mr. Y's Testimony, also filed April 22, 1999 (Dkt. #206) [collectively "the April 22nd Rulings"]. *See also* Dkt. ##176, 187–88, 193, 4/20/99 endorsement on Dkt. #197, 4/26/99 endorsement on Dkt. #202, 5/4/99 endorsement on Dkt. #208, 5/3/99 endorsement on Dkt. #212, 5/3/99 endorsement on Dkt. #218, and 5/4/99 endorsement on Dkt. #221. At all relevant times, plaintiff has been represented by dedicated counsel, and for nearly two years, has been represented by the Jerome N. Frank Legal Services of the Yale Law School. (*See* Dkts. ##22–24, 55–61, 96–98, 115–17, 119, 139, 153,

156–58 & 3/19/99 endorsement thereon, 214–15 and 4/27/99 endorsement thereon).[1]

Jury selection was held on Monday, April 26, 1999 and the trial began immediately thereafter; testimony was heard for nine days, from the afternoon of April 26, 1999 until April 30, and from May 4 until May 7, 1999. (Dkt. ##211, 217, 219–20, 222–24, 227–29, 233–34).[2] Plaintiff called six witnesses (plaintiff, two other inmates, and three experts) and admitted twenty-one exhibits; defendants called nine witnesses and admitted eleven exhibits. (Dkt. ##228–29, 234–35). Closing arguments were held on Friday, May 7, 1999, as well as the jury instructions. (Dkt. #232; Transcript of May 7, 1999, filed August 16, 1999 (Dkt. #255) ["5/7/99 Tr."] at 44–164). The jury continued its deliberations until Monday, May 10, 1999, at which time the ten-person jury found for plaintiff in the amount of $0.00, which, at the suggestion of defense counsel, was increased to $1.00. (Dkt. ##235–37, 5/7/99 Tr. at 164–66; Transcript of May 10, 1999, filed August 16, 1999 (Dkt. #256) ["5/10/99 Tr."] at 2–11).

The parties have filed a plethora of post-trial motions, five of which will be addressed in this Ruling, filed in chronological order as follows. First, on May 10, 1999, defendants filed a Motion for Mistrial (Dkt. #230), with brief in support filed on June 7, 1999 (Dkt. #250), as to which plaintiff filed a brief in opposition on June 28, 1999 (Dkt. #251). Second, on May 18, 1999, defendants filed a Renewed Motion for Judgment After Trial, Or, In The Alternative For A New Trial (Dkt. #239), as to which plaintiff filed a brief in opposition on June 28, 1999 (Dkt. #251). Third, on May 24, 1999, plaintiff filed his Motion For A New Trial With Respect to Damages Only (Dkt. ##243–44), as to which defendants filed a brief in opposition on June 2, 1999 (Dkt. #248). Fourth, on June 2, 1999, defendants filed their Motion for Judgment As A Matter of Law (JMOL) After

Trial (Dkts. ##245, 247), as to which plaintiff filed a brief in opposition on June 28, 1999 (Dkt. #251). And last, also on June 2, 1999, defendants filed their Motion for New Trial And/Or To Alter Or Amend Judgment, supported by a brief filed on June 7, 1999 (Dkts. ##246, 250), as to which plaintiff filed a brief in opposition on June 28, 1999 (Dkt. #251).

For the reasons stated below, defendants' Motion for Mistrial (Dkt. # 230) is *denied,* defendants' Renewed Motion for Judgment After Trial, Or, In The Alternative For A New Trial (Dkt. # 239) is *denied;* plaintiff's Motion For A New Trial With Respect to Damages Only (Dkt. # 243) is *denied;* defendants' Motion for Judgment As A Matter of Law (JMOL) After Trial (Dkt. # 245) is *denied;* and defendants' Motion for New Trial And/Or To Alter Or Amend Judgment (Dkt. # 246) is *denied.*

## I. DISCUSSION

The Court will address the issues raised in these five motions in a different order than that presented by counsel.

### A. PLAINTIFF'S MOTION FOR A NEW TRIAL WITH RESPECT TO DAMAGES ONLY (Dkt. 243)

In this motion, plaintiff makes the following four arguments: (1) the jury's verdict was inconsistent in finding liability for plaintiff but awarding no damages, which warrants a new trial on the issue of damages only (Dkt. # 244, at 2–4, 9–11); (2) the court's entrance of $1 nominal damages, at the suggestion of defense counsel, was an impermissible additur (*id.* at 5); (3) the award of $0 or $1 in damages for a rape shocks the conscience (*id.* at 5–9); and (4) the court's erroneous evidentiary rulings inflamed the jury against plaintiff, including (a) permitting cross-examination of plaintiff regarding his potential deportation at the con-

---

1. His previous counsel included several well-respected litigators, including Kathleen Eldergill of Beck & Eldergill (Dkt. # 24), and several attorneys from the large Hartford law firm, Shipman & Goodwin (Dkts. ## 59–61, 96).

 While these motions were pending, an additional appearance was filed for plaintiff by Norman Pattis, of Williams & Pattis. (Dkt. # 257).

Present counsel, however, have not filed a motion to withdraw their appearance.

2. Plaintiff's testimony, on April 26 and April 27, 1999, has been transcribed at the Court's request. (Dkt. ## 253–54). *See also* Dkt. # 255 (including testimony of plaintiff's rebuttal witness on 5/7/99).

clusion of his current sentence, (b) permitting gratuitous and improper statements by defense counsel and the defense witnesses that characterized the Somers prison as housing "the worst of the worst" among DOC inmates, (c) defense counsel's reference to plaintiff's participation in Alcoholics Anonymous and Narcotics Anonymous, and (d) improperly admitting Exhs. C–F[3] (*id.* at 11–14).

In response, defendants argue that: (1) the jury's findings on credibility and damages are entitled to great deference (Dkt. # 248, at 2–6); (2) the trial court properly directed a $1 judgment (*id.* at 6–10); (3) plaintiff has waived all the claims he now makes in his motion (*id.* at 10–12); (4) an alleged compromise verdict requires a directed JMOL for defendants as plaintiff failed to achieve a unanimous verdict as to liability (*id.* at 12–14); (5) if a new trial is ordered, it must be all issues, *i.e.*, liability and damages (*id.* at 14); and (6) plaintiff's evidentiary arguments are without merit (*id.* at 15–17).

Again, the Court will address the issues raised in this motion in a different order than that presented by counsel.

### 1. WAIVER

In the Joint Pretrial Memorandum ["JTM"], filed under seal on April 19, 1999 (Dkt. # 199), the parties' proposed jury instructions differed dramatically on the essential elements of plaintiff's Eighth Amendment claims. (*Compare* Plaintiff's Proposed Jury Instructions at 14–16 *with* Defendants' Proposed Jury Instructions ¶¶ 48–53). During the course of the trial, multiple (and lengthy) charge conferences were held, at which the Court distributed drafts of the jury charge. By agreement of counsel, the jury was given a copy of the jury instructions. (Dkt. # 235, Court Exh. 1). The final version, which was closer to plaintiff's proposal than that of defendants, provided as follows:

> To demonstrate that the defendants violated his eighth amendment rights, plaintiff must prove two components: an objective component and a subjective component.

### A. Objective component—sufficiently serious harm

The objective component of the eighth amendment tests whether the harm is objectively serious enough to violate the constitution. The plaintiff can satisfy this component by showing that the harm alleged is objectively, sufficiently serious. A plaintiff can demonstrate a harm that is sufficiently serious under the constitution by showing that he was incarcerated under conditions posing a substantial risk of serious harm.

(Court Exh. 1, at 25).

The plaintiff's Proposed Jury Instructions contained no reference to nominal damages, whereas defendants' Proposed Jury Instructions included a brief discussion. (Defendants' Proposed Jury Instructions ¶ 65). The Jury Charge included the following discussion:

> If, after considering all the evidence presented, you find that defendants violated plaintiff's constitutional rights, but that plaintiff suffered no injury as a result of the violation, you may award plaintiff "nominal damages." Nominal damages are awarded in recognition of the fact that a person's rights have been violated. You would award nominal damages if you conclude that plaintiff suffered a deprivation of his rights without any resulting injury or damage.
>
> You may not award both nominal and compensatory damages to plaintiff; either plaintiff suffered injuries that were legally caused by defendants, in which case you must award compensatory damages, or he did not suffer any injuries, in which case you may award nominal damages, such as ten dollars.

(Court Exh. 1, at 40–41).

In the JTM, the parties also submitted suggested verdict forms. Plaintiff's suggested form asked two questions regarding liability and four questions regarding damages, whereas defendants' proposed form asked

---

**3.** This pertains to the April 12th Ruling.

two questions regarding liability,[4] seven questions concerning qualified immunity, and four questions regarding damages. In the JTM, plaintiff filed a four-page objection to defendants' proposed verdict form. During the charge conferences, the Court similarly distributed drafts of the jury verdict form. The final version, submitted to the jury, raised two questions regarding liability, two questions regarding qualified immunity, and three questions regarding damages. (Dkt. # 236).

At the conclusion of the jury charge on May 7, 1999, plaintiff took no exception to the charge. (5/7/99 Tr. At 153). Defense counsel's various exceptions included an exception to the charge with respect to the Eighth Amendment standard and the elimination of his specific questions regarding qualified immunity. (Id. at 153–54, 157–58). Plaintiff responded that the jury charge was consistent with prevailing U.S. Supreme Court case law regarding the Eighth Amendment. (Id. at 158–59). With respect to the verdict form, plaintiff's counsel replied:

> While we had talked preliminarily about a general verdict form, we believe that the final form was appropriate and gives clear direction to the jury in the order in which to consider the different issues, and it's plaintiff's position that if there were a more complicated form asking for specific findings of fact with the specific issues, there was danger of an inconsistent verdict.

(Id. at 160–61). In overruling defendants' objections, the Court stated:

> [W]ith respect to the verdict form, if I had agreed to the defendants' request for specific factual findings on the question of qualified immunity, I would be obligated to give the same leeway to the plaintiff with respect to his claim, and I thought that the verdict form would be far too confusing and burdensome and cumbersome for the [jury], and that the best course of action was simply to ask the final question, and I believe that there was symmetry in the

verdict form, between the defendants' obligation and the plaintiff's obligation.

(Id. at 162, 163).

After deliberating for some time on May 10, 1999 (see Dkt. #235, Court Exh. 2; 5/10/99 Tr. at 2), the jury delivered the following note: "Question 1.a. of jury interrogatories. Under the objective component, does a harm have to have occurred, considering last sentence, page 25 of jury instructions." (Dkt. # 235, Court Exh. 3; 5/10/99 Tr. at 2). In a chambers conference regarding this note and in open court, plaintiff's counsel argued that the appropriate response was "no," in that simply placing plaintiff in a cell with Mr. D was the harm in and of itself, whereas defense counsel argued that the appropriate response was "yes." (5/10/99 Tr. at 2–4). Agreeing with defense counsel, the Court instructed the jury that the response to their question was "yes." (Id. at 4–5).

Within an hour, the jury reached its verdict. (Id. at 5). In the Jury Interrogatories and Verdict (Dkt. # 236), the jury responded as follows: "1.A. Did the plaintiff, Bobby James, prove, by a fair preponderance of the evidence, that the defendants violated his Eighth Amendment rights to be free from cruel and unusual punishment, as defined in the jury charge? YES." For Question 1.B., the jury answered that both defendants had violated plaintiff's Eighth Amendment rights. With regard to Question 2.A., the jury responded that defendants had not proven, "by a fair preponderance of the evidence, that [they were] not liable to plaintiff under the doctrine of qualified immunity, as defined in the jury charge." For Question 3.A., the jury found that $0 was the "fair, just and reasonable compensation for any physical, mental or emotional damages proximately caused by the conduct of the defendant(s)." In their answer to Question 3.B., the jury declined to award punitive damages against either defendant. (See also 5/10/99 Tr. at 5–7).

After the jury was polled at plaintiff's request (id. at 7–8), counsel were given an opportunity to review the verdict form to ascertain whether it was harmonious under

---

4. At trial, plaintiff dropped his Fourteenth Amendment claims, so that defendants' two questions regarding equal protection became unnecessary.

FED.R.CIV.P. 49(b). (*Id.* at 8–9). Defense counsel commented: "[I]f your Honor, as a matter of law, wishes to enter a verdict of one dollar nominal damages, that would make it consistent." (*Id.* at 9). Plaintiff's counsel only inquired as to punitive damages (*id.* at 9), following which the Court entered judgment for plaintiff against both defendants in the amount of one dollar pursuant to FED.R.CIV.P. 58. (*Id.* at 9–10).

During the colloquy regarding the verdict form, plaintiff's counsel never requested the Court to "return the jury for further consideration of its answers and verdict" nor did she move for a new trial. A similar situation arose in *Manes v. Metro–North Commuter R.R.,* 801 F.Supp. 954 (D.Conn.1992), *aff'd mem.,* 990 F.2d 622 (2d Cir.1993), an action filed by a railroad employee under the Federal Employers' Liability Act ["FELA"], in which the jury awarded plaintiff $1,097,701.21 in damages for past and future lost earnings and past and future medical expenses, but nothing for past and future pain and suffering, loss of enjoyment of life, and fear of the future. 801 F.Supp. at 956–57. In defendant's motion for new trial, the defendant Railroad argued that such an award was inconsistent and irreconcilable. *Id.* at 957. Among various reasons for denying such motion, U.S. District Judge Alan H. Nevas held, in a forceful ruling, as follow:

> [T]he Railroad never objected to the jury's verdict when announced by the court at the conclusion of trial. As a general rule, "if trial counsel fails to object to any asserted inconsistencies and does not move for resubmission of the inconsistent verdict before the jury is discharged, the party's right to seek a new trial is waived." The purpose for this rule "is to allow the original jury to eliminate any inconsistencies without the need to present the evidence to a new jury." The rule, moreover, prevents a dissatisfied party, such as the Railroad, "from misusing procedural rules and obtaining a new trial for an asserted inconsistent verdict."

The Second Circuit appears to take a guarded approach to the per se application of the waiver rule, acknowledging that a party's failure to make a timely objection "carries some weight" in the court's analysis of the waiver issue but that a court may not completely abdicate its responsibility to resolve inconsistencies in jury verdicts. Despite the Railroad's claim to the contrary, this contextual approach to the waiver issue, in the court's opinion, does not contravene the view that a party may waive its right to object to a jury verdict.

. . .

[T]he court is mystified as to why counsel was not prepared to raise the alleged inconsistency prior to the dismissal of the jury. Indeed, the court gave counsel ample opportunity to familiarize himself with the verdict form, the entire jury charge, and to discuss the elements of those documents with the court during a charge conference in chambers prior to the delivery of the charge by the court. Thus, the court can find no meritorious reason, justification, or excuse as to why counsel failed to notice an inconsistency of the proportions alleged by the Railroad and proceed, in turn, to raise the issue with the court in a timely manner after the verdict was announced.

. . .

The court was never aware of an inconsistency in the verdict prior to discharging the panel. Indeed, as the court explains later in the body of its ruling the court does not believe that the verdict is inconsistent. If counsel for the Railroad believes that the alleged inconsistency was so blatant, counsel had an obligation to object immediately after the jury verdict was announced. The court finds absolutely nothing in the transcript to indicate that the Railroad was prohibited from making such a timely objection to the verdict.

More importantly, the failure of counsel for the Railroad to make a timely objection to the jury's verdict prohibited the court from evaluating the merits of the Railroad's claim and, if necessary, resubmitting the issue to the jury prior to the discharge of the jury and the conclusion of the trial. By failing to raise a timely objection, the Railroad insured that the jury, a jury that had already found against it for damages in excess of $1,000,000,

would be prevented from resolving inconsistencies in its own verdict. Instead, the Railroad chose to raise the issue at a later time in a motion that seeks the wasteful, but self-serving remedy of retrying the entire case before a new jury....

The gravamen of the Railroad's claim is that the failure of the jury to award Manes damages for pain and suffering is inconsistent with its damage award of lost earnings and medical expenses. Assuming that the failure to award pain and suffering constitutes an inconsistency, an assumption the court does not endorse, a timely objection would have insured the resubmission of the damages issue to the jury for consideration of additional damages for pain and suffering. Only after such a resubmission could the court adequately evaluate whether the verdict constituted error at all, let alone an error of the magnitude required for a new trial.... The conversion of the Railroad's failure to make a timely objection, a failure that appears to the court to be in the Railroad's self interest, into a means for obtaining a new trial, constitutes the type of procedural abuse by a dissatisfied party that the waiver rule was designed to prohibit.... Accordingly, the court finds that the failure to raise a timely objection to the jury verdict prior to the jury's discharge constitutes a waiver and prohibits the Railroad from asserting verdict inconsistency as a basis for a new trial....

*Id.* at 958–59, 960–61 (multiple citations & footnotes omitted). Judge Nevas further cautioned:

To hold otherwise, the court believes, would set dangerous precedent. Allowing the Railroad to challenge the jury's verdict in the absence of a timely objection runs counter to the sanctity normally accorded such verdicts and would encourage rampant abuse of Rule 49. Thus, refusal to apply the waiver rule here would merely encourage a dissatisfied party to withhold timely notice of problems, problems that likely could be cured at trial by the original jury, as a pretext for seeking a second

bite of the apple before a new jury that might be more receptive to its claims.

*Id.* at 961 n. 4.

The same conclusion was reached more recently in *Blissett v. Eisensmidt*, 940 F.Supp. 449 (N.D.N.Y.1996), where a jury found in favor of the plaintiff-inmate on his claim of excessive force against three correctional officers, awarded $5,600 in compensatory damages, awarded him nearly $50,000 in punitive damages against these defendants, but found for defendants on the plaintiff's claim for battery. *Id.* at 450–51. In their post-trial motion, defendants argued that such finding was inconsistent. The district judge similarly held that defendants had waived this argument, as defense counsel had not objected to the verdict form prior to its submission to the jury and despite an opportunity to do so, did not object to the jury's answers to the verdict form as inconsistent before the jury was discharged. *Id.* at 453–55. *See also Heidorf v. Town of Northumberland*, No. 96–CV–0473, 1998 WL 357319, at *2–3 (N.D.N.Y. June 22, 1998) (where defendant neither objected to answers returned by jury nor moved for resubmission to resolve the alleged inconsistency, defendant's silence was deemed to be waiver); *Provetto v. Pathmark Stores, Inc.*, No. 95 CIV 1013(DLC)(RLE), 1997 WL 66775, at *6 (S.D.N.Y. Feb. 18, 1997) (same); *Bseirani v. Mahshie*, 881 F.Supp. 778, 784–85 (N.D.N.Y. 1995), *aff'd mem.*, 107 F.3d 2 (2d Cir.1997). *See generally* 9 MOORE'S FED.PRAC. § 49.20[6][b] (3d ed.1999); 9A C. WRIGHT & A. MILLER, FED.PRAC. & PROC. § 2513 (1993).

Thus, under all the circumstances in this case, plaintiff has waived his argument that the jury's answers to the verdict form were inconsistent.

### 2. THE JURY'S FINDINGS WERE NOT INCONSISTENT

■ Even though it has found that plaintiff has waived his arguments, the Court will nonetheless address the merits of plaintiff's motion.

Plaintiff argues that the jury's verdict of $0 was inconsistent with the Court's instructions on nominal damages, was inconsistent with the Court's response to the jury's ques-

tion that a harm must have occurred, and was internally inconsistent with a finding of liability against defendants, thus requiring a new trial on the issue of damages.

As U.S. Magistrate Judge Holly B. Fitzsimmons summarized earlier this year:

> The standard of review applicable to motions for a new trial under rule 59, Fed. R.Civ.P., is less stringent than that for a rule 50(b) motion for judgment as a matter of law. Unlike the rule 50(b) standard, the trial judge may order a new trial on the grounds that, in the judge's opinion, the decision was against the clear weight of the evidence. In deciding whether to grant a new trial, the court is free to consider the credibility of the witnesses and the weight of the evidence, although such considerations are not appropriate under rule 50(b). Additionally, in considering a motion for a new trial the court need not view the evidence in the light most favorable to the nonmoving party, as it must in a motion for a judgment as a matter of law under rule 50(b).
>
> Generally, a court may grant a new trial because the verdict is against the weight of the evidence, damages are excessive, the verdict is inconsistent, substantial errors were made in admitting or excluding evidence, or in charging the jury, or because a material issue was improperly submitted or withdrawn from a jury. This list is not exhaustive, as a trial court may order a new trial "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed.R.Civ.P. 59. Despite this great latitude, it is well settled that the trial judge is to "abstain from interfering with the verdict unless it is quite clear that the jury has reached a seriously erroneous result. The judge's duty is essentially to ensure that there is no miscarriage of justice."
>
> . . .
>
> The burden of showing the harmful error rests with the moving party, and unless there is "plain error," failure to object to

an issue during trial precludes review of that issue on a motion for a new trial.

*Hardy v. Saliva Diagnostic Systems, Inc.*, 52 F.Supp.2d 333, 339–40 (D.Conn.1999) (multiple citations omitted).

Plaintiff relies principally upon *Thomas v. Stalter*, 20 F.3d 298 (7th Cir.1994), in which the plaintiff-inmate had arrived at prison in 1985 with severe periodontal disease; he rejected the prison dentist's recommendation that he have all his teeth removed. At trial, the dentist testified that plaintiff's teeth would last from one to five years from 1985. *Id.* at 300. In October 1987, plaintiff was investigated regarding the stabbing of another inmate; pursuant to a court order, in December 1987, plaintiff was required to submit to a blood test at an emergency room. Ten correctional officers were necessary to restrain plaintiff; plaintiff alleged that defendant Heath struck him in the mouth, loosening his teeth. The next day, plaintiff's bottom front teeth were removed. *Id.* As here, the jury returned a verdict for plaintiff on the issue of liability but awarded him no damages. And as here, both parties filed post-trial motions for new trial. *Id.* at 300–01.

The Seventh Circuit held that the district judge properly had granted defendant's motion for a new trial on both liability and damages:

> We agree that the jury's finding of liability is in irreconcilable conflict with its award of zero damages. One of the court's instructions specifically required the jury to find damages before it could find liability. Given this instruction, the jury's finding of liability implies that it also found that Heath proximately caused injury to Mr. Thomas. Nevertheless, the jury awarded Mr. Thomas no money damages.

*Id.* at 303 (footnote omitted). However, the district judge had also "grounded its grant of a new trial on the determination that the verdict was against the weight of the evidence." *Id.* at 304. The Seventh Circuit held that such a finding was not an abuse of the trial court's discretion. *Id.*[5]

**5.** Contrary to the position taken by the Seventh Circuit in *Thomas*, 20 F.3d at 303 n. 5, the other

Seventh Circuit case cited by plaintiff, *Rosario v. Livaditis*, 963 F.2d 1013 (7th Cir.1992), is distin-

Defendants, in contrast, have cited the recent decision of *Amato v. City of Saratoga Springs*, 170 F.3d 311 (2d Cir.1999), in which the plaintiff alleged excessive force by the police officers who had arrested him. The jury found one officer liable for excessive force, the other officer liable for failure to intervene, awarded no compensatory damages but instead awarded one dollar in nominal damages, and awarded $20,000 in punitive damages against the assaulting officer. *Id.* at 313–14 (footnote omitted). The trial judge denied plaintiff's motion for a new trial on the issue of damages only, which was affirmed by the Second Circuit:

> [A] jury finding of excessive force does not automatically entitle a claimant to compensatory damages as a matter of law. In certain circumstances, a jury could reasonably determine that compensatory damages are inappropriate even where excessive force was used. For instance, where a victim's claims of injury lack credibility, or where the injuries lack monetary value, a jury could reasonably award nominal damages.

*Id.* at 314 (citations omitted). In *Amato,* the plaintiff had testified as to a variety of injuries as a result of the altercation and had two non-treating physicians, a neurologist and a neuropsychologist, testify that he suffered from postconcussive injury and dysthymia. However, there had been significant testimony questioning plaintiff's credibility, as well as evidence that plaintiff suffered from headaches and dizziness even prior to the incident; in addition, defense counsel, in cross-examination of the doctors, effectively raised the issue of malingering. *Id.* at 315. Thus, the Second Circuit held that a jury reasonably could have determined that plaintiff was not entitled to compensatory damages. *Id.* at 315–16.

The same conclusion can be reached here. In his presentation of his case and in particular, his alleged damages, plaintiff was his own worst enemy. His testimony was flat, business-like, devoid of emotion, and often sounded contrived. Plaintiff testified in some detail regarding the alleged rape by his cellmate, Mr. D, during the night of October 14–15, 1991 and the "despicable feeling" and "devastating effects" he experienced immediately thereafter, which included difficulty walking, reluctance to leave his cell for two days, and difficulty sleeping (4/26/99 Tr. at 30–36, 38–43). In the prison, he received mental health counseling two to three times per week, took an antidepressant to help him sleep for two and one half years, and was placed in a single cell so that he could sleep and urinate alone. (*Id.* at 52–53, 59–60). However, his testimony regarding alleged damages was not compelling—teasing from some other inmates in the shower, perceived scorn by one correctional officer, and feeling "drained ... psychologically [and] physically." (*Id.* at 64, 65–66).

Defense counsel effectively cross-examined plaintiff regarding the various contradictory versions he gave of the alleged rape, including where Mr. D touched him first, what

---

guishable. In *Rosario,* some 1400 former students of "sham" cosmetology schools commenced a class action against the beauty schools, alleging violations of the Racketeer Influenced and Corrupt Organizations Act ["RICO"] and the Illinois Consumer Fraud Act ["ICFA"]. After an eighteen-day trial, the jury found defendants liable under both RICO and ICFA, but awarded $0 for the RICO violation and $640,224 for the ICFA violation. *Id.* at 1015–16. The district court denied plaintiff's motion for new trial on damages on the RICO claim, which was reversed by the Seventh Circuit as an abuse of discretion. *Id.* at 1020–22. As the court explained in *Rosario,* "a plaintiff injured by RICO violations deserves 'complete recovery.'" *Id.* at 1020 (citation omitted). In contrast, in the present case, the jury was instructed on the possibility of nominal damages, if it found that compensatory damages were not appropriate.

The additional case cited by plaintiff, *Fox v. City University of New York*, No. 94 Civ. 4398(CSH), 1999 WL 33875 (S.D.N.Y. Jan. 26, 1999), is also inapposite. In *Fox,* a Title VII case, the jury had awarded plaintiff $43,833 in backpay, but denied her any recovery for future losses of salary or benefits, emotional pain and suffering or other nonpecuniary loss, or punitive damages. *Id.* at *1, 7. Plaintiff filed a motion for new trial on the issue of damages. *Id.* at *1, 7. The district judge granted plaintiff's motion regarding backpay, in that the evidence indicated lost wages in excess of $100,000. *Id.* at *11–12 (footnotes omitted). The district judge similarly found no basis for the jury's rejection of plaintiff's claim for front pay, although it acknowledged that the evidence on nonpecuniary loss was "thin." *Id.* at *12–16.

sounds plaintiff made during the incident, how Mr. D dragged him from the top bunk, and how Mr. D subdued him. (4/27/99 Tr. at 9–14, 23–25, 27–30). In his closing argument, defense counsel emphasized these discrepancies. (5/7/99 Tr. at 103–08). Plaintiff presented the testimony of a psychologist, Dr. Anne Pratt, who testified during plaintiff's case-in-chief and in rebuttal (5/7/99 Tr. at 5–42) that plaintiff suffered from posttraumatic stress disorder from the incident and was not malingering. Defendants, in contrast, presented two psychologists, Dr. Paul Chaplin and Dr. Brett Rayford, both with DOC experience, who opined that plaintiff indeed was malingering.

Defense counsel also effectively cross-examined plaintiff regarding his failure to report the alleged rape on a timely basis and instead his choice to remain behind in a cell with his alleged attacker, a course of action which appears counterintuitive. (4/27/99 Tr. at 18–22).[6]

As in *Amato*, a jury reasonably could have determined that plaintiff was not entitled to compensatory damages, but only nominal damages. Contrary to plaintiff's contentions, there is no inconsistency between the jury having found that defendants were deliberately indifferent to plaintiff's safety by placing him in a cell with Mr. D, a suspected sexual predator, but nevertheless awarding only nominal damages, in that plaintiff was not a particularly credible witness, his own testimony regarding his damages was not particularly impressive, and defendants presented expert testimony regarding malingering. Although at face value, the jury verdict may appear irrational, and at odds with the Court's response to the jury's question (Court Exh. 3), there was a simple logic to the jury's reasoned consideration—the jury found fault with defendants' continued placement of Mr. D in a cellblock with new prison

admittees, despite strong suggestion of Mr. D's sexual proclivities, but the jury gave no credence to plaintiff's claims of damages as a result of his encounter with Mr. D.

### 3. THE ENTRY OF $1 NOMINAL DAMAGES WAS NOT IMPERMISSIBLE ADDITUR

Plaintiff argues that the entrance of $1 nominal damages was impermissible additur, a practice which has long been prohibited in federal court in light of the Seventh Amendment. *Dimick v. Schiedt*, 293 U.S. 474, 55 S.Ct. 296, 79 L.Ed. 603 (1935). Plaintiff further cites the recent case, *Liriano v. Hobart Corp.*, 170 F.3d 264 (2d Cir.1999), but that decision is not helpful to plaintiff. In *Liriano*, the Second Circuit held that the trial judge's increase of the undisputed hospital bill to the damage award was "no true additur":

> The district court did not divine a figure and then make the defendants choose between an increased damage award and a new trial. It simply adjusted the jury award to account for a discrete item that manifestly should have been part of the damage calculations and as to whose amount there was no dispute. When a jury has already found liability, federal courts may make such adjustments without running afoul of *Dimick*.

*Id.* at 272–73 (multiple citations omitted). As in *Liriano*, the jury here already had found liability, and declined to award compensatory damages. As such, it was appropriate for the Court to impose nominal damages, as the jury properly had been charged on that issue.

The present case is thus analogous to *Gibeau v. Nellis*, 18 F.3d 107 (2d Cir.1994), cited by defendants. The plaintiff-inmate in *Gibeau* had engaged in a physical altercation

---

**6.** Plaintiff testified on direct examination that on his first night in the cell with Mr. D, he removed his underpants, washed them in the sink, and then erroneously placed his underwear against Mr. D's washcloth, thus angering him. (4/26/99 Tr. at 17–18). This behavior is incongruous with someone who expressed fear of homosexual rape in prison. Plaintiff further failed to mention this incident during his prior deposition. (4/26/99 Tr. at 81–83).

Plaintiff also testified that until he met with Captain King to report the alleged rape, he had not realized that his brother, Johnny James, was also an inmate at the same prison; plaintiff later was housed with his brother in the Q Block for two to three months. (4/26/99 Tr. at 53, 55–56, 59).

with three correctional officers. The jury found that one defendant had used excessive force against the plaintiff, but that the incident had not caused any injury to him. The verdict form did not provide for an award of nominal damages, although the jury had been instructed regarding such damages. *Id.* at 108–10. In contrast to the argument made here, Gibeau argued that the district court erred in failing to award him nominal damages, with which the Second Circuit agreed:

> Because an award of nominal damages is not discretionary where a substantive constitutional right has been violated, the district court should have instructed the jury that it must award nominal damages if it were to find that Gibeau's Eighth Amendment rights were violated, and it should have provided a corresponding verdict form. . . .
>
> . . .
>
> In directing the district court to award nominal damages contrary to the jury verdict, we are mindful that a federal court's increase of a jury award would constitute impermissible additur where it would violate the Seventh Amendment right to a jury trial. However, a remand for an entry of nominal damages in the instant case would not violate the Seventh Amendment.

*Id.* at 110–11 (*citing Dimick*) (additional citation omitted).

■ The result in *Gibeau* was applied last year in *Robinson v. Cattaraugus County*, 147

F.3d 153 (2d Cir.1998), in which the jury found that both defendants had violated the Fourth Amendment rights of plaintiffs Robinson and Shine, awarded Shine's estate $30,000 in compensatory damages, but awarded Robinson nothing, and found that neither plaintiff should be awarded punitive damages. Plaintiffs moved for a new trial on the issue of damages, which was denied by the district judge. The court instead awarded Robinson $1 nominal damages as against each defendant. *Id.* at 159. The Second Circuit affirmed: "Although the Seventh Amendment generally prohibits a court from augmenting a jury's award of damages, that proscription is not violated by the court's entering judgment awarding nominal damages when the jury has failed or refused to do so and the claimant is entitled to damages as a matter of law." *Id.* at 162 (*citing Dimick & Gibeau*). *See also LeBlanc–Sternberg v. Fletcher*, 67 F.3d 412, 431 (2d Cir.1995) (same).[7]

■ If the judicial imposition of nominal damages is appropriate in *Gibeau* and *Robinson*, then it surely was appropriate in the instant case, particularly when plaintiff's counsel failed to object or to suggest that the matter be returned to the jury for further consideration.

### 4. AN AWARD OF $1 IN THIS CASE DOES NOT SHOCK THE CONSCIENCE

■ Plaintiff has cited *Atkins v. New York City*, 143 F.3d 100 (2d Cir.1998), where the

---

**7.** In *Gibeau, LeBlanc–Sternberg,* and *Robinson,* the Second Circuit held that it is "plain error" to instruct a jury merely that, having found a constitutional violation, it "may" award nominal damages. *Robinson,* 147 F.3d at 162; *LeBlanc–Sternberg,* 67 F.3d at 431; *Gibeau,* 18 F.3d at 110–11.

As quoted earlier, the jury instructions on nominal damages, to which plaintiff here did not take exception, informed the jury that "[I]f, after considering all the evidence presented, you find that defendants violated plaintiff's constitutional rights, but that plaintiff suffered no injury as a result of the violation, you *may* award plaintiff 'nominal damages.'" (emphasis added). However, the jury charge continued: "Nominal damages are awarded in recognition of the fact that a person's rights have been violated. You *would* award nominal damages if you conclude that plaintiff suffered a deprivation of his rights without any resulting injury or damage. You may

not award both nominal and compensatory damages to plaintiff; either plaintiff suffered injuries that were legally caused by defendants, in which case you must award compensatory damages, or he did not suffer any injuries, in which case you *may* award nominal damages, such as ten dollars." (emphasis added). (Court Exh. 1, at 40–41).

Although the discretionary verb "may" is used twice in the jury charge, the charge did instruct the jury that it "*would* award nominal damages if [it concludes] that plaintiff suffered a deprivation of his rights without any resulting injury or damage." In addition, the juxtaposition of compensatory and nominal damages enlightened the jury that it should impose one form of damages or the other.

Even if this portion of the charge were erroneous, as in *Robinson,* the error was "cured" by the trial court having entered a judgment for nominal damages. 147 F.3d at 162–63.

jury, in finding that one defendant-police officer had falsely arrested plaintiff and had used excessive force against him, and that two other defendant-police officers had failed to intervene, awarded plaintiff no compensatory or punitive damages, and only $1 in nominal damages. *Id.* at 101–02. The district court denied plaintiff's Rule 59 motion for a new trial on the issue of damages. The Second Circuit reversed:

> A beating severe enough to leave marks is sufficient proof of a compensable injury. Although the jury may have properly discounted some of his alleged physical and emotional injuries because the medical opinions and testimony were based in part on Atkins's subjective symptoms, the jury's rejection of Atkins's undisputed injuries and of the pain and suffering from the beating itself is unsupportable.

*Id.* at 104 (citation omitted).

Plaintiff further has cited *Mathie v. Fries,* 121 F.3d 808 (2d Cir.1997), in which the plaintiff-inmate had been subjected to repeated sexual abuse, over a two-month period, by the defendant-correctional officer, who had been employed as the sergeant in charge of internal security at the prison. *Id.* at 810–11. After a bench trial, the district judge awarded plaintiff $250,000 in compensatory damages and $500,000 in punitive damages. *Id.* at 811. The Second Circuit affirmed with respect to compensatory damages, *id.* at 812–15, but reduced the punitive damages to $200,000. *Id.* at 816–18.

At the opposite spectrum, however, is *Butler v. Dowd,* 979 F.2d 661 (8th Cir.1992) (*en banc* ), *cert. denied,* 508 U.S. 930, 113 S.Ct. 2395, 124 L.Ed.2d 297 (1993), where the four plaintiff-inmates had sued the prison warden for failing to protect them from multiple homosexual rapes by other inmates. *Id.* at 663–69. The jury found in favor of plaintiffs, but awarded them only $1 each in nominal damages. *Id.* at 669. The trial judge denied plaintiff's motion for a new trial on damages, which the Eighth Circuit affirmed:

> The jury rationally could have concluded that many of the plaintiffs' injuries would have occurred even if the defendant's conduct had met constitutional injuries. Moreover, plaintiffs failed to produce at trial objective medical evidence supporting their physical injuries or detailing the extent of their emotional injuries. The amount of damages, therefore, depended largely upon the credibility of the plaintiffs' testimony concerning their injuries. We find that based upon these factors, the jury's decision to award only nominal damages was not "plain injustice" or so "shocking" as to require a new trial on the issue of damages.

*Id.* at 669. The jury in *Butler,* for credibility reasons, apparently rejected the testimony of inmates that they suffered from insomnia (for which medication was prescribed by a prison psychiatrist), from spells of vomiting, anal bleeding, depression, inability to urinate or defecate, loss of appetite, headaches, and tearfulness. *Id.* at 672. And like plaintiff James here, the plaintiffs in *Butler* chose to remain with their attackers, rather than reporting the incidents and seeking protective custody, which reflected upon their credibility. *Id.* Thus, the Eighth Circuit concluded that the jury award was "not aberrant." *Id.*

As the United States Supreme Court acknowledged in *Farmer v. Brennan,* 511 U.S. 825, 852–53, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), the:

> brutality [of homosexual rape] is the equivalent of torture, and is offensive to any modern standard of dignity. The horrors experienced by many young inmates ... border on the unimaginable. Prison rape not only threatens the lives of those who fall prey to their aggressors, but is potentially devastating to the human spirit. Shame, depression, and a shattering loss of self-esteem accompany the perpetual terror the victim thereafter must endure.

(Blackmun, J., concurring) (citation omitted). As plaintiff acknowledges, the factual context of *Mathies* is far more disturbing and distressing than the allegations here, in that the attacks were horrifying brutal, repeated over a two-month period, and the aggressor was a high ranking officer within the prison. This case is far closer to *Butler,* in that there were legitimate credibility issues over plaintiff's behavior and claim for damages. As in *Butler,* considering all these factors, the jury

verdict was "not aberrant" and does not "shock the conscience."

### 5. THE EVIDENTIARY RULINGS DID NOT INFLAME THE JURY AGAINST PLAINTIFF

As previously indicated, plaintiff lastly argues the court's erroneous evidentiary rulings inflamed the jury against plaintiff, including (a) permitting cross-examination of plaintiff regarding his potential deportation at the conclusion of his current sentence, (b) permitting gratuitous and improper statements by defense counsel and the defense witnesses that the Somers prison housed "the worst of the worst" among DOC inmates, (c) defense counsel's reference to plaintiff's participation in Alcoholics Anonymous and Narcotics Anonymous, and (d) improperly admitting Exhs. C–F.

■ Defense counsel's first questions of plaintiff regarded his scheduled deportation, following a deportation hearing held at the Somers prison; plaintiff's objections were overruled by the Court. (4/26/99 Tr. at 67–68). The issue of deportation was never raised again, nor did plaintiff ever seek an instruction to the jury on this issue. The cases cited by plaintiff do not support plaintiff's arguments. In *Mischalski v. Ford Motor Co.*, 935 F.Supp. 203, 204–05 (E.D.N.Y. 1996), the parties agreed that the plaintiff's illegal alien status was not a bar to recovery in federal court, and thus the Magistrate Judge concluded that plaintiff's illegal alien status was, "by itself, irrelevant" and could not be used to prevent him from recovering compensatory damages in his personal injury case. The admission of plaintiff's impending deportation was not admitted to bar recovery by plaintiff James, but simply to the extent that it had an impact on future damages. The same is true with respect to *Peterson v. Neme*, 222 Va. 477, 281 S.E.2d 869 (Va.1981) (illegal alien could recover, in personal case, as an element of damages, wages she lost prior to trial). Similarly, in *Hagl v. Jacob Stern & Sons, Inc.*, 396 F.Supp. 779, 784–85 (E.D.Pa.1975), a personal injury case, the

District Judge observed that "[w]hether [plaintiff] will be deported ... might have been relevant in the damages portion of the trial" but there had been no evidence on this point because plaintiff had retained an attorney to seek permanent residency status. The District Judge concluded: "In short, there was nothing which would have justified the jury's reducing damages because plaintiff is an alien who might conceivably face some unspecified immigration action at an unknown time." *Id.* at 785. *See also Klapa v. O & Y Liberty Plaza Co.*, 168 Misc.2d 911, 645 N.Y.S.2d 281 (Sup.Ct.1996) (where defendants offered no evidence that deportation proceedings had begun or were contemplated, plaintiff's status as illegal alien was irrelevant to his claim for lost wages). In contrast to *Hagl* and *Klapa*, plaintiff testified, upon cross-examination, that a deportation hearing already had been held and that he is scheduled to be deported upon completion of his state sentence. Thus, under these cases, the admission of plaintiff's deportation status was proper.

■ Plaintiff further argues that the Court allowed repeated, gratuitous and improper statements by defense counsel and witnesses that the Somers prison housed the "worst of the worst" inmates in Connecticut. Again, plaintiff sought no curative instructions on this issue. DOC Commissioner John Armstrong, defendants' last witness on May 6, 1999, testified that in October 1991, Somers was the state's only maximum security prison, holding the most serious, most violent inmates. To the extent that defense counsel allegedly referred to Somers inmates as being the "worst of the worst" during the course of the trial,[8] the jury was instructed that "statements and arguments of counsel are not evidence in the case." (Court Exh. 1, at 4). The Court further instructed the jury that the "case should be considered and decided by you as an action between persons of equal standing in the community, of equal worth, and holding the same or similar stations in life," and was twice reminded that

---

8. This expression was not used during defense counsel's closing argument. (5/7/99 Tr. at 99–116). This judicial officer has reviewed her detailed trial notes and found no such references

during trial. At the Court's request, the Court Monitor also reviewed his company's notes and similarly did not find the use of this expression.

"[i]Inmates and correctional officials are entitled to the same fair trial at your hands as any private individual." (*Id.* at 3, 19). Therefore, to the extent that any allegedly "gratuitous" comments were made by defense counsel, the jury instructions adequately redirected the jury's attention.

Third, plaintiff argues that defense counsel made reference to plaintiff's participation in Narcotics Anonymous ["NA"] and Alcoholics Anonymous ["AA"]. The only reference to alcohol took place when defense counsel read aloud plaintiff's response to a deposition question regarding the prison programs in which plaintiff participated, which included: "I've participated in the Alcohol Treatment program." (4/27/99 Tr. at 5). There are no such references in the cross-examination of plaintiff on April 26–27, 1999, nor was there any reference to NA or AA in defense counsel's closing argument. (5/7/99 Tr. at 99–116).[9]

Lastly, plaintiff argues that the Court improperly admitted four of plaintiff's disciplinary reports (Exhs. C, D, E & F). These exhibits were discussed in detail in the April 12th Ruling and the discussions therein are incorporated by reference. Exhibits D & F were admitted during the direct examination of defendant Dion on May 6, 1999, consistent with the April 12th Ruling, as they are reports upon which admitting officers typically rely in making cell assignments. Exhibits C & E were admitted during the direct examination of Dr. Edward Blanchette on May 4, 1999, as reflecting the physical prowess and strength of plaintiff, to refute plaintiff's testimony on April 26, 1999 that in October 1991, Mr. D was much older and stronger than plaintiff, so that plaintiff could not defend himself against Mr. D's advances. (4/26/99 Tr. at 11, 12, 33).[10]

These evidentiary items, individually and in conjunction with one another, were hardly "inflammatory."

**B. DEFENDANTS' RENEWED MOTION FOR JUDGMENT AFTER TRIAL, OR, IN THE ALTERNATIVE FOR A NEW TRIAL (Dkt. # 239)**

In this motion, defendants assert the following six arguments: (1) it was reversible error to allow evidence of Inmates X, Y, and Z beyond the paper reports on which the release decision for Mr. D was based; (2) it was reversible prejudicial error to show the videotape of Mr. Y; (3) it was reversible prejudicial error to fail to admit plaintiff's record of a feigned suicide as reflected in the Mount Sinai Hospital record of 1988, a mere three years prior to the events in this case; (4) the November 5th Ruling erroneously rejected *Page v. Manson,* Civ. No. 15,370 (D.Conn.1976) (Clarie, J.) as the long-standing legal standard in this district; (5) plaintiff's closing argument by certified intern, James Park, constituted irrevocable reversible error; and (6) the jury award of zero damages, which the Court revised to a nominal judgment of one dollar, is consistent with a judgment for defendants as a matter of law. (Dkt. # 239).

In response, plaintiff argues that: the April 13th Ruling was correct regarding Inmates X, Y and Z (Dkt. # 251, at 6–7); the April 22nd Rulings were correct regarding the videotaped testimony of Inmate Y (*id.* at 7); the Court properly excluded the 1988 Mount Sinai Hospital records (*id.* at 8–10); Mr. Parks' closing argument was not improper and does not warrant a new trial (*id.* at 15–20); and plaintiff is entitled to a new trial on the issue of damages only (*id.* at 21–24).

*1. EVIDENTIARY ARGUMENTS*

These evidentiary issues regarding Inmates X, Y and Z and the videotape of Inmate Y were discussed in detail in the April 13th Ruling and in the April 22nd Rulings, and the discussions therein are incorporated by reference here.

The admissibility of the 1988 Mount Sinai Hospital Records (Exh. U for identification

---

**9.** *See* note 8 *supra.*

**10.** On cross-examination, plaintiff acknowledged that he is an accomplished soccer player, who particularly enjoys penalty kicks. (4/27/99 Tr. at 4–5, 16–17).

purposes only) was discussed, outside the presence of the jury, during the direct examination of Dr. Edward Blanchette, DOC's Medical Director, on May 6, 1999 and during the cross-examination of Dr. Martin Paul Chaplin, a DOC psychologist, on May 7, 1999. As the Court indicated on May 7, 1999, while the document may have been relevant on the issue of malingering by plaintiff, the admission of such document would have been greatly prejudicial to plaintiff, in that defense counsel did not obtain such document from Mount Sinai Hospital until after the trial had begun and plaintiff's current counsel had not seen the document prior to trial.

### 2.   NOVEMBER 5TH RULING

The discussions in the November 5th Ruling regarding qualified immunity are incorporated by reference here and will not be discussed further.

### 3.   PARKS' CLOSING ARGUMENT

■ On Wednesday, April 28, 1999, the third day of trial, the Court permitted the videotape deposition of Inmate Y to be played for the jury. As previously indicated, plaintiff was represented at trial by Attorney Brett Dignam and more than six law students, of whom certified intern James Park was the most involved. (Dkt. ##115, 119, 139, 156–58, 214–15). Immediately after the tape ended, in the presence of the jury, law student Park requested that the two DOC guards present in the courtroom sign an acknowledgment of the Protective Order. (Excerpt from Transcript of April 28, 1999, filed October 15, 1999 (Dkt. # 258) ["4/28/99 Tr."] at 2). Defense counsel objected to the request itself and that it had been made in front of the jury: "I would think that's inappropriate to make that comment in front of the jury. . . . It's totally designed to prejudice the jury. The comments are inappropriate and should be stricken. The jury should be instructed to disregard the insinuations made by Mr. Park." (*Id.*). The Court thereupon instructed the jury to disregard Park's statement and excused them. (*Id.*). After a brief discussion of the merits of plaintiff's request (*id.* at 2–5), the Court suggested that plaintiff's counsel apologize to defense coun-

sel, indicate the inappropriateness of the comment, and ask the jury to disregard it, to be followed by an additional instruction from the Court. (*Id.* at 5–6). Attorney Dignam, Park's supervising attorney, then added her personal apology for the outburst. (*Id.* at 6).

Upon the jury's return to the courtroom, the following colloquy took place:

MR. PARK: Prior to exiting you may or may not have heard . . . an inappropriate comment that I made. . . .

I just wanted to offer my apology to defendant's counsel as well as defendants for any improper insinuations that may . . . have followed from that particular remark. We plead to you to please disregard that statement. We do not mean to insinuate that any of these particular correctional officers who are present in the room have any bad faith efforts or are unworthy of trust. In fact, they serve a very essential function within our society and we would please ask you to disregard that particular statement, and I would also wish to offer my apology to the defendants' counsel.

Thank you.

THE COURT: [Is] defense counsel satisfied?

MR. STROM: I just think it should be directed to the particular officers.

MR. PARK: Directed to the particular officers, I apologize for any insinuations that have been made.

THE COURT: And again, the jury is to completely disregard the comments of plaintiff's counsel. . . .

(*Id.* at 7–8). After the jury left, defense counsel remarked: "I do appreciate the comments of plaintiff's counsel and Mr. Park. . . . I hope that it was all an innocent mistake and due to inexperience, but I am troubled by that comment." (*Id.* at 9).

As previously indicated, counsel gave their closing arguments to the jury on Friday, May 7, 1999. Park presented the closing argument for plaintiff. (5/7/99 Tr. at 45–94). In chambers, counsel had agreed to limit their closing arguments to approximately thirty minutes. Park's closing, however, lasted approximately ninety minutes. Moreover, during his closing argument, Parks in-

terjected his own beliefs (*id.* at 68, 84, 88, 90, 93), vouched for the credibility of witnesses (*id.* at 81), and made references to issues which had been withdrawn by plaintiff (*id.* at 85–87, 91). Although not reflected in the transcript, during Park's closing argument, Attorneys Dignam and Strom conferred with one another, although neither interrupted Park.

The jury was excused immediately after Park's closing argument, whereupon defense counsel moved for a mistrial based upon Park's closing argument. (*Id.* at 94–96). Attorney Dignam responded that she took "responsibility for any inaccuracies or defects in his argument, of course," and agreed that

it might be appropriate to issue a cautionary instruction to the jury about vouching for credibility. We certainly can instruct the jury that our beliefs, or Mr. Park's beliefs, or any of his counsel's beliefs about the credibility of the witnesses are, of course, irrelevant, on the strength of any testimony.

(*Id.* at 96. *See also id.* at 96–98). The Court then indicated that a brief recess would be taken "after defense counsel's closing argument for counsel to prepare a joint stipulation for the Court to read to the jury immediately prior to the jury instructions." (*Id.* at 98). Defense counsel thereafter gave his closing argument, after which the luncheon recess was taken. (*Id.* at 99–117).

The Court met with counsel during the luncheon recess and all participants agreed that consistent with the response to Park's outburst on April 28, 1999, the supervising attorney would apologize to defendants. After the recess but before the jury returned to the courtroom, defense counsel renewed his motion for mistrial based upon Park's inappropriate closing argument, adding:

I know Mr. Park worked at length to go through his argument. I know it was his first closing argument. I did not want to interrupt him, claim objection, and ... move for a mistrial in the middle of his first argument. I just thought that was not fair to Mr. Park who had worked so hard in this case.

Ordinarily, I might have done that with seasoned counsel, and I don't want the record to reflect, ... if this ever becomes an issue on appeal, that somehow we waived our objections to the plaintiff's closing arguments.... As a courtesy to Mr. Park, I didn't interrupt, and I just didn't know how to handle it, and ... we've discussed that with your Honor in chambers, and that plaintiff's counsel has a proposal which is agreeable to the defendants.

(*Id.* at 117). The Court commented:

And my sentiments were exactly the same, in light of the fact that Mr. Park is a law student and I wanted to accord him this courtesy of completing his closing arguments, even though I also recognized some of the improprieties of comments that he'd made.

It's my understanding, however, that plaintiff's counsel has an agreed upon statement that she will read to the jury immediately before my jury instructions.

In light of the fact that there is a curative apology, the motion for mistrial is denied without prejudice. To the extent that there is a plaintiff's verdict, obviously defense counsel is free to renew whatever motion is appropriate.

(*Id.* at 117–18).

As soon as the jury returned to the courtroom following the luncheon recess, Attorney Dignam apologized as follows:

[Mr. Park's] comments to you in closing argument were erroneous in a couple of respects for which I take full responsibility, and I now would like to apologize to Defendants Tilghman and Dion, individually, for any false impression that we gave you, and therefore, I am making the following three statements.

During that closing argument it was stated at several points that Mr. Park either believed or did not believe certain evidence or testimony. You must disregard those comments. His belief, or lack of belief, in the evidence is irrelevant. As the Court will instruct you, issues of credibility are exclusively for you to decide.

Second, we just want to remind you that plaintiff makes no claim in this case that he contracted a sexually-transmitted disease from Mr. D. To the extent that com-

ments by counsel may be interpreted to suggest otherwise, you should ignore them. You must ignore them.

And finally, the defendants, Mr. Dion and Mr. Tilghman, were not themselves responsible for the promulgation of protocols about the collection of forensic evidence.

Is that acceptable to defense counsel?

MR. STROM: Without waiving our claims, Your Honor, it's acceptable for now.

(*Id.* at 119–20).

After the jury charge (*id.* at 120–53) and after the jury retired for its deliberations, defense counsel repeated:

Again, I note that I did not wish to interrupt Mr. Park. Hopefully, he will be a new member of the bar of this Court or some other court, ... but somewhere he's [going to] be a very, very able lawyer, and I would like to commend everyone on the part of the plaintiff's side. The efforts of all the students, as well as Attorney Dignam, were ... outstanding in terms of the amount of work, but quite honestly, it just got out of hand to the point where it deprived my clients of a fair trial, especially with the closing arguments, and I just want to preserve our claims for mistrial with regard to all evidentiary rulings, as well as the closing argument.

(*Id.* at 163).

The issue of a prosecutor's improper remarks during summation was discussed in great detail in the Second Circuit's decision in *Floyd v. Meachum*, 907 F.2d 347 (2d Cir. 1990), in which the prosecutor called the criminal defendant a liar more than forty times in her original and rebuttal closing arguments, bolstered the credibility of the primary witness for the prosecution, and questioned the defendant's decision to invoke his right not to testify under the Fifth Amendment. *Id.* at 349–51. Neither attorney asked for the trial court's guidance during the closing arguments, nor did either side seek a curative charge. *Id.* at 351–52. The defendant was convicted, and his conviction was affirmed through the state appellate system. *Id.* at 352–53. The district court ruled

for the State on Floyd's federal habeas petition, which was reversed by the Second Circuit. The Second Circuit devised a three-part test for determining whether a new trial was warranted: "the severity of the misconduct; the measures adopted to cure the misconduct; and the certainty of conviction absent the improper statements." *Id.* at 355 (citation omitted).

With respect to the breadth and severity of the improper statements, the Second Circuit

emphasize[d] that our holding today is based on the cumulative effect of the three alleged categories of improper remarks. We also emphasize that, unlike many appeals raising claims of prosecutorial misconduct, this case does not involve one, or a few isolated, brief episodes; rather, it involves repeated and escalating prosecutorial misconduct, from initial to closing summation.

*Id.* at 353. The Second Circuit further held that "[w]hile each instance of prosecutorial misconduct, standing alone, might not justify reversal, the effect of all of them requires it." *Id.* at 357.

With respect to the second factor, the Second Circuit held that the trial judge's failure to give an instruction other than his normal instruction that argument of counsel is not evidence, even in the absence of a request from counsel, was inadequate. *Id.* at 355–56. And lastly, the Second Circuit observed that the evidence against Floyd had not been strong. *Id.* at 356.

Last year, the Second Circuit applied this three-part test to reach the opposite conclusion in *Tankleff v. Senkowski*, 135 F.3d 235 (2d Cir.1998), regarding the prosecutor's comment during closing argument, in which he questioned why Tankleff had not called his half-sister as a witness at his criminal trial for having murdered their parents. *Id.* at 251–52. In concluding that Tankleff had not met his burden of showing substantial prejudice, the Second Circuit characterized the prosecutor's comments as "short and fleeting." *Id.* at 253. The Second Circuit further concluded that while it was error for the trial judge to have refused defense counsel's request for a specific curative instruction, "looking at all the circumstances, we

conclude that the standard instructions given by the trial court were probably sufficient to cure any harm that the prosecutor's misstatements may have caused." *Id.* And lastly, the Second Circuit held that this had not been such a "closely balanced [trial] that the prosecutor's comments were likely to have had a substantial effect on the jury." *Id.* (citation omitted).

The present situation resembles *Tankleff* far more closely than *Floyd.* As previously indicated, during his ninety-minute closing argument, Park on five occasions interjected his own beliefs, once vouched for the credibility of a witness, and twice made references to issues which had been withdrawn by plaintiff. (5/7/99 Tr. at 68, 81, 84, 85–87, 88, 90, 91, 93). Although Park's clearly improper statements were not "short and fleeting" as in *Tankleff,* 135 F.3d at 253, neither were they "repeated and escalating" as in *Floyd,* 907 F.2d at 353. Thus, while Park's inappropriate and incorrect comments were serious, they were not "severe."

Second, unlike *Floyd,* where the jury received no curative guidance, the jury here was well informed as to the erroneous nature of Park's statements. As previously described, immediately following Park's closing argument and upon defense counsel's having moved for a mistrial, Attorney Dignam agreed that "it might be appropriate to issue a cautionary instruction to the jury...." (5/7/99 Tr. at 96). The Court then indicated that after defense counsel's closing argument, a brief recess would be taken "for counsel to prepare a joint stipulation *for the Court to read to the jury immediately prior to jury instructions."* (*Id.* at 98) (emphasis added). A conference was held in chambers during the luncheon recess, in which all participants agreed, consistent with the response to Park's outburst on April 28, 1999, that instead of a joint stipulation, Attorney Dignam would apologize to the jury. After the recess but before the jury returned to the courtroom, defense counsel stated: "As a courtesy to Mr. Park, I didn't interrupt, and I just didn't know how to handle it, and ... we've discussed that with your Honor in chambers, and that *plaintiff's counsel has a proposal which is agreeable to the defen-*

*dants."* (*Id.* at 117) (emphasis added). The Court added, "It's my understanding ... that *plaintiff's counsel has an agreed upon statement that she will read to the jury* immediately before my' jury instructions." (*Id.* at 118) (emphasis added). At the conclusion of Attorney Dignam's apology to defendants and correcting statements to the jury, she inquired, "Is that acceptable to defense counsel?," to which Attorney Strom replied, "Without waiving our claims, ... *it's acceptable for now.".* (*Id.* at 120) (emphasis added).

Thus, unlike *Floyd,* the jury heard Attorney Dignam's apology to defendants and was informed, by plaintiff's counsel, that three aspects of Park's closing argument were incorrect. Prior to the luncheon recess, the Court initially had indicated that she would give a curative instruction, but counsel agreed, in chambers, that the damage would be best repaired by an apology and statement from plaintiff's counsel, as had been done on April 28. In light of that agreement, which was confirmed in open court, the Court declined from adding a curative instruction. Thus, the curative statement was more than "adequate" for the jury to learn that it should ignore Park's inappropriate comments, even if the statement was an apology from plaintiff's counsel rather than as a curative instruction from the Court, counsel having agreed that under the circumstances and given Park's prior history, the apology would be more effective. The apology of plaintiff's counsel, after months of diligent preparation by her and the myriad of law students involved, spoke volumes in the courtroom.

The last factor is also far closer to the *Tankleff* case than to *Floyd,* for the jury clearly had not been unduly swayed by Park's improper comments, in light of the verdict it reached. The jury members apparently dismissed Park's comments to youthful over exuberance, to which the jury previously had been exposed on April 28. Contrary to defense counsel's arguments on May 7, 1999 and in this pending motion, defendants were not "deprived ... of a fair trial, especially with the closing arguments...." (5/7/99 Tr. at 163).

The recent cases cited by defendants, in which improper closing arguments were

made in the civil context, as opposed to the habeas context, support the same conclusion. For example, in *Spicer v. Rossetti*, 150 F.3d 642 (7th Cir.1998), an action in which the plaintiff-prisoner alleged excessive force by the defendants-correctional officers, plaintiff's counsel had acknowledged, during his closing argument, that "we don't know everything that happened on" the day of the incident in question; during his closing argument, defense counsel construed this one comment as indicating that even Spicer's "own lawyer doesn't believe his client." *Id.* at 643. The trial judge overruled plaintiff's objection, reminding the jury that argument of counsel was not evidence. *Id.* After the jury found for defendants, the Seventh Circuit held that reversal was warranted:

> While we recognize that "improper comments during closing argument rarely rise to the level of reversible error," we believe that defense counsel's comments here warrant reversal. Just as counsel may not express his beliefs regarding the honesty of the opposing party's witnesses, he may not express his belief regarding opposing counsel's opinions of honesty. These opinions have no place in a court of law, and defense counsel's conduct was grossly inappropriate.... We cannot say that these comments might not have influenced the jury's verdict; indeed since the case turned entirely on Spicer's credibility, versus that of the guards, the improper comments were an egregious attack into the heart of the plaintiff's case.

*Id.* at 644 (citations omitted).

A new trial also was ordered in *Commercial Credit Business Loans, Inc. v. Martin*, 590 F.Supp. 328 (E.D.Pa.1984), an action to collect on a guaranty, where, "[d]uring the course of th[e] protracted trial," the district judge "admonish[ed defense] counsel repeatedly for his continuous pattern of misbehavior[ ]" and his behavior was "particularly egregious during his summation[,]" with at least twenty-three instances of improper statements. *Id.* at 332–33. After his closing argument but before his rebuttal, the district judge again admonished him outside the presence of jury, but "[n]otwithstanding [the court's] warning, counsel's improper remarks continued with renewed vigor...." *Id.* at 333. The court concluded:

> This is not a case where the comments have been made infrequently or were isolated from one another by otherwise acceptable behavior. A pattern of objectionable conduct by defense counsel pervaded the entire trial and was particularly flagrant during counsel's closing argument. Because this was the final occasion for the jury to hear from either the parties or their attorneys before they began their deliberations, the prejudicial impact of these final remarks was especially acute.

*Id.* at 334–35. The trial judge further concluded that "[d]espite the curative instructions ... the following day, the odoriferous taint spread by counsel's frequent and grave improprieties could not have been erased." *Id.* at 335 (citations omitted).

The opposite conclusion was reached in *Strobl v. New York Mercantile Exchange*, 582 F.Supp. 770 (S.D.N.Y.1984), *aff'd on other grounds*, 768 F.2d 22 (2d Cir.), *cert. denied sub nom. Simplot v. Strobl*, 474 U.S. 1006, 106 S.Ct. 527, 88 L.Ed.2d 459 (1985), which concerned the default of potato futures contracts. After the jury returned a $460,000 verdict for plaintiff, defendants argued that a new trial should be granted because plaintiff's counsel had expressed his personal opinions during closing argument regarding defendants' failure to mitigate, their default, their defense that they were engaged in legitimate hedging, and his reference to one witness as a "convicted felon." *Id.* at 779–80. The district judge concluded that "these allegations of improper conduct by counsel in the context of the trial as a whole ... do not merit a new trial[ ]" and "did not constitute ... extremely egregious behavior of counsel...." *Id.* at 780.

Again, the improper comments by Parks during his closing argument did not question the veracity of opposing counsel, as in *Spicer*, 150 F.3d at 643–44, and were not "repeated[ ]" and "continuous" as in *Commercial Credit Business Loans*, 590 F.Supp. at 332–35. Park's inappropriate observations hardly constituted "egregious behavior of counsel," for which a new trial is warranted.

### 4. AMOUNT OF JURY VERDICT

Defendants contend that jury award of zero damages, which the Court revised to a nominal judgment of one dollar, is consistent with a judgment for defendants as a matter of law. The propriety of the jury's verdict was discussed extensively in Section I.A.2 *supra* and need not be repeated here.

### C. DEFENDANTS' MOTION FOR MISTRIAL (Dkt. # 230)

In this motion, defendants argue that after Park's improper closing argument, "the Court totally abnegated its role here, refused to limit Mr. Park to his thirty minutes, failed to strike Mr. Park's comments from the record, declined to caution the jury and in an effort to get this case to the jury, ignored plain reversible error, irreparably harming the defendants' right to a fair trial." (Dkt. # 230 at. 1–2). Defense counsel represented that "in an effort to be courteous, defendants' counsel did not interrupt and object." (*Id.* at 1). *See also* (Dkt. # 250 at 3–4). Defendants further argue that while the Court committed *per se* reversible error in failing to give further cautionary instructions, but "[e]ven if such cautionary instructions had been given, in a case such as this where it is a difficult and potentially very close case, the irrevocable prejudicial damage of Mr. Park's closing remarks, however innocent or naive they may have been, clearly justifies the granting of a mistrial." (*Id.* at 8). Defense counsel further hypothesized:

> Mr. Park's outrageous conduct, essentially calling the defendants liars, and calling the defendants' witnesses liars, while at the same time throwing the prestige of the Jerome N. Frank Legal Services Organization of the Yale Law School behind the vouching as to credibility, irrevocably prejudiced the defendants. Clearly some jurors had to think, why would the Yale Law School and the many students involved in the case vouch in open court that they believe the plaintiff and they do not believe the defendants, unless there was some credence to plaintiff's claims. This vouching created the compromise verdict scenario where some jurors wanted to give the plaintiff something, a symbolic victory,

when in fact, they did not believe him to be injured and did not believe him to be entitled to any damages.

(*Id.*).

This issue has been addressed extensively in Section I.B.3 *supra*. Park's improper statements were not severe, the jury received curative information, and the jury clearly discounted Park's inappropriate comments. Park's erroneous "vouching" did not create a "compromise verdict scenario."

### D. DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW (JMOL) AFTER TRIAL (Dkt. # 245)

In this motion, filed under both FED. R.CIV.P. 50(b) and 59(e), defendants raise the following nine arguments: (1) the weight of the evidence was insufficient to sustain a verdict of liability against defendants (Dkt. # 247, at 1); (2) the JMOL for defendants is consistent with the jury's conclusion that plaintiff failed to prove that he incurred any actual damages, or that he suffered any emotional distress or mental anguish due to the actions or non-actions of the defendants (*id.* at 1, 3, 7–8); (3) judgment as a matter of law for defendants should enter because defendants are entitled to qualified immunity as a matter of law (*id.* at 1, 2–3, 4–6, 6–7); (4) but for the trial court's prejudicial errors as to evidentiary rulings, *i.e.*, allowing Mr. Y to testify by video deposition, no reasonable jury would have found for plaintiff as to liability (*id.* at 2); (5) it was reversible error to allow evidence of Inmates X, Y, and Z beyond the paper reports on which the release decision for Mr. D was based. (*id.*); (6) it was reversible prejudicial error to fail to admit plaintiff's record of a feigned suicide as reflected in the Mount Sinai Hospital record of 1988, a mere three years prior to the events in this case (*id.*); (7) the November 5th Ruling erroneously rejected *Page v. Manson*, Civ. No. 15,370 (D.Conn.1976) (Clarie, J.) as the long-standing legal standard in this district (*id.*); (8) plaintiff's closing argument by Park constituted irrevocable reversible error (*id.*).; and (9) it was error not to use the defendants' special interrogatories (*id.* at 6).

Again, the Court will address these issues in a different order than that presented by counsel.

### 1. WEIGHT OF THE EVIDENCE/LIABILITY AND DAMAGES

As a district judge ruled earlier this year:

Under Rule 50(a) a party may move for JMOL during trial at any time prior to the submission of the case to the jury. Rule 50(a)(2). If the trial court does not grant that motion, and thereafter the jury returns an unfavorable verdict against the movant, Rule 50(b) allows that party to "renew" the motion, the post-trial motion being limited to the grounds that were specifically raised in the prior motion for JMOL. Rule 50(b) provides that "if a jury returns a verdict for which there is not a legally sufficient evidentiary basis, the district court may either order a new trial or direct the entry of judgment as a matter of law."

"A judgment as a matter of law may not properly be granted under Rule 50 unless the evidence, viewed in the light most favorable to the opposing party, is insufficient to permit a reasonable juror to find in [his or] her favor." In passing upon a Rule 50 motion, the trial court "must give deference to all credibility determinations and reasonable inferences of the jury, and it may not itself weigh the credibility of witnesses or consider the weight of the evidence." Thus, ... "judgment as a matter of law should not be granted unless (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded persons could not arrive at a verdict against it."

*Fox v. City University of New York*, No. 94 Civ. 4398(CSH), 1999 WL 33875, at *1–2 (S.D.N.Y. Jan. 26, 1999) (multiple citations omitted). *See also Samara Brothers, Inc. v. Wal–Mart Stores, Inc.*, 165 F.3d 120, 123–24 (2d Cir.1998), *cert. granted in part,* —— U.S. ——, 120 S.Ct. 308, 145 L.Ed.2d 35 (1999); *Myers v. County of Orange*, 157 F.3d 66, 73 (2d Cir.1998), *cert. denied,* 525 U.S. 1146, 119 S.Ct. 1042, 143 L.Ed.2d 49 (1999).

The standards for Rule 59(e) motions previously were addressed in Section I.A.2 *supra,* citing the *Hardy* decision issued by Magistrate Judge Fitzsimmons earlier this year.

Under the strict standard of Rule 50(b), JMOL cannot be granted here, nor should a new trial be ordered under the less stringent standard of review under Rule 59(e). There was more than ample evidence upon which a reasonable jury could have found in plaintiff's favor against defendants, and the jury's decision was not against the clear weight of the evidence. The most damaging evidence against defendants were the DOC's reports regarding the prior accusations of other inmates that Mr. D sexually assaulted them or sought sexual favors from them.

The first such allegation took place on August 5, 1990, by Inmate X, and this allegation was believed by a correctional officer, who called Mr. D "a known homosexual." (Exh. 15). After an administrative hearing, Mr. D was placed in segregation because he was "seen as a threat to the safety and security of the institutional community." (Exh. 20). Mr. D later was released from segregation and given a warning by defendant Tilghman. Both Exhs. 15 and 20 indicate that they were reviewed by the warden. *See also* Exh. 1A (Mr. D's housing card).

On November 8, 1990, Inmate Y was admitted to Somers; during his admission interview, Inmate Y revealed to Captain Locario that he had been sexually assaulted at Somers when Inmate Y had been there in March 1990, but refused to identify his assailant. (Exh. 16). The report continues: "I asked him if inmate Mr. D was the inmate who assaulted him, he dropped his head and said yes it was. The reason I mentioned Mr. D['s] name is the information I received in the past about Mr. D, plus Mr. D was housed in [Block] J–1 while Mr. Y was there in March." (*Id.*). Inmate Y further informed Captain Locario that Mr. D had tape recorded the rape, played the tape back to Inmate Y, and then threatened to "expose this to other inmates if he did not cooperate in the future." (*Id.*). Mr. Y thereupon was trans-

ferred out of Somers. (*Id.*). On November 13, 1990, Mr. D's cell was searched and tapes were confiscated. (Exh. 28). Inmate Y testified, on videotape, in a manner which was consistent with his written statements regarding this incident.

On March 18, 1991, Inmate Z alleged that he had been raped by Mr. D, defendant Dion was notified of this accusation, Inmate Z was taken to the prison hospital, and later selected Mr. D from a photo array. (Exh. 17). This exhibit similarly appears to have been reviewed by defendant Tilghman. Following an administrative hearing held on March 22, 1991, Mr. D was placed in segregation, as the "committee felt that Mr. D['s] return to general population would jeopardize his personal safety and may present a threat to the safety and security of the institutional community." (Exh. 21). *See also* Exh. 1A. Despite the Connecticut State Police having declined to prosecute Mr. D for this alleged rape (Exh. 23) and the prison's doctor having found no evidence of rape (Exh. 19), defendant Tilghman observed in a memorandum, dated April 18, 1991: "Although there is no evidence, Mr. D's history has been marred by these kinds of claims but unsubstantiated." (Exh. 19).

On May 3, 1991, Mr. D was assigned to G Block, a quarantined block for new admittees. A prison memorandum, dated June 28, 1991, regarding Mr. D also noted a sexual assault charge against him. (Exh. 11). As previously indicated, plaintiff alleged that he was raped by Mr. D on October 14–15, 1991, after which Mr. D returned to administrative segregation. (Exhs. 18, 22, 24, & 1A).

Plaintiff presented the testimony of two expert witnesses, Robert Dumond, an expert on prison rape, and James Aiken, formerly Indiana Commissioner of Corrections. Dumond testified that it was imprudent to have placed Mr. D in a block with new inmates, especially when the institutional staff were aware of, and concerned about, Mr. D being a sexual predator. Aiken testified that of the seven allegations of sexual assault at the Somers prison in 1990–91, four involved Mr. D. Aiken also testified there were sufficient "bells and whistles," if not "sirens and alarms," that Mr. D posed a danger to other inmates and that defendants had not resolved the matter. Aiken opined that certainly after the third allegation against Mr. D, Mr. D should not have been permitted to remain in general population, and especially not in G Block, a quarantine block with new inmates. He described defendants' actions as "putting wolves with the sheep" and creating "fertile grounds for a predatorial inmate to gain control over other inmates." Aiken further opined that plaintiff's alleged rape was "preventable," that it was "not very difficult" at all to deal with Mr. D, and that he should have been excluded from the general population for the safety of other inmates.

Major Thomas Maloney, defendant Dion, defendant Tilghman, and DOC Commissioner John Armstrong all agreed that after Inmate Z's accusation against Mr. D, it was safest to return Mr. D to G Block, which had a higher staff-inmate ratio than the general population blocks. Defendant Dion testified that "bells and whistles" were acted upon, by placing Mr. D in administrative segregation immediately following each accusation.

The jury was well within its bounds in crediting the testimony of plaintiff's two experts that defendants' response to the situation was inadequate and in rejecting the explanations of the DOC witnesses.

The issue of the jury's assessment of damages has been addressed extensively in Sections I.A.2, I.A.3 & I.A.4 *supra* and need not be repeated here. *See also* Section I.B.4 *supra*.

### 2. QUALIFIED IMMUNITY/VERDICT FORM

As previously discussed in Section I.A.1 *supra*, in the Jury Interrogatories and Verdict, the jury responded that defendants had not proven, "by a fair preponderance of the evidence, that [they were] not liable to plaintiff under the doctrine of qualified immunity, as defined in the jury charge." (Court Exh. 3, Question 2.A.). Defendants similarly seek JMOL or a new trial on the issue of qualified immunity.

This Court previously ruled in the November 5th Ruling that for purposes of qualified immunity, "the applicable ... standard in the Second Circuit was ... that in order to

prevail on a sexual assault claim, a plaintiff 'would have to prove that there was a pervasive risk of harm to him from other prisoners and that prison officials displayed deliberate indifference to the danger.'" 1998 WL 849393, at *9 (citations omitted). *See also* Section I.B.2. *supra*

The jury properly was instructed:

At the time of the incidents giving rise to this lawsuit, prison officials . . . were under no legal obligation to release inmate Mr. D from administrative segregation upon completion of any criminal investigation. On the contrary, prison officials retained the discretion to keep inmate Mr. D in segregation for the protection of other inmates or Mr. D himself, or to release him, based on their knowledge, experience, and judgment.

. . . The defendant is entitled to qualified immunity only if first, he did not know what he did was in violation of federal law, and if second, a competent warden or assistant warden could not have been expected at the time to know that the conduct was in violation of federal law.

In deciding what a competent warden or assistant warden would have known about the legality of defendant's conduct, you may consider the nature of the defendant's official duties, the character of his official position, the information which was known to the defendant or not known to him, and the events which confronted him at that time. You must ask yourself what a reasonable warden or assistant warden in each defendant's situation would have believed about the legality of defendant's conduct. . . . If you find that a reasonable warden or assistant warden in each defendant's situation would believe his conduct to be lawful, then this element will be satisfied.

(Court Exh. 1, at 34–36).

Again, with respect to the jury's finding on the issue of qualified immunity, there was more than ample evidence upon which a reasonable jury could have found in plaintiff's favor against defendants, and the jury's decision was not against the clear weight of the evidence. The jury was well within its bounds in evaluating what a competent or reasonable warden or assistant warden in each defendant's situation would have believed about the legality of defendant's conduct and in crediting the testimony of plaintiff's two experts over that of the DOC witnesses.

As previously discussed in Section I.A.1 *supra,* following the jury charge, defense counsel took an exception to the verdict form, arguing instead that the Court should have utilized his more complicated form, which included seven questions regarding qualified immunity. (5/7/99 Tr. at 157–58). In overruling defendants' objections, the Court responded:

[W]ith respect to the verdict form, if I had agreed to the defendants' request for specific factual findings on the question of qualified immunity, I would be obligated to give the same leeway to the plaintiff with respect to his claim, and I thought that the verdict form would be far too confusing and burdensome and cumbersome for the [jury], and that the best course of action was simply to ask the final question, and I believe that there was symmetry in the verdict form, between the defendants' obligation and the plaintiff's obligation.

(*Id.* at 162, 163).

### 3. EVIDENTIARY ISSUES

These issues, regarding the videotape of Inmate Y, the testimony of Inmates X, Y and Z, and the Mount Sinai medical records previously were addressed in Section I.B.1. *supra* and will not be repeated here.

### 4. PARK'S CLOSING ARGUMENT

The issue of Park's closing argument was addressed in Sections I.B.3 & I.C. *supra* and will not be repeated here.

### E. DEFENDANTS' MOTION FOR NEW TRIAL AND/OR TO ALTER OR AMEND JUDGMENT (Dkt. #246)

In this motion, filed under Rule 59(e), defendants argue that they are entitled to a new trial and/or to alter or amend the judgment for the following ten reasons: (1) plaintiff's closing argument constitutes reversible error (Dkt. #250, at 3–8); (2) the video deposition of Mr. Y should have been exclud-

ed (*id.* at 9–10); (3) the Mount Sinai hospital record should have been allowed (*id.* at 10); (4) the evidence of plaintiff's sexual activities should have been allowed (*id.* at 10–11); (5) the alleged prior bad acts of Mr. D, and Inmates X, Y and Z should have been precluded (*id.* at 11); (6) the evidence of subsequent remedial measures should have been excluded (*id.* at 12); (7) the jury charge on supervisory liability should not have been given (*id.*); (8) the detailed special factual interrogatories should have been given (*id.* at 12–13); (9) the Court should have used the jury verdict form submitted by defendants (*id.* at 13); and (10) the Court utilized the wrong legal standard for failure to protect cases and for release from segregation (*id.* at 13–14).[11]

### 1. PARK'S CLOSING ARGUMENT

This issue was addressed extensively in Section I.B.3 *supra* and will not be repeated here. *See also* Sections I.C. & I.D.4 *supra.*

### 2. EVIDENTIARY ISSUES

The videotape deposition of Inmate Y, the reports of Inmates X, Y and Z, and the 1988 Mount Sinai Hospital records were discussed in Section I.B.1 *supra* and will not be repeated here. *See also* Section I.D.3 *supra.*

The issue of plaintiff's sexual activities first surfaced during plaintiff's cross-examination on April 26, 1999, with counsel agreeing that the Court could defer its ruling until the next morning. (4/26/99 Tr. at 72–75). On April 27, 1999, immediately prior to the continued cross-examination of plaintiff, the Court issued a lengthy oral ruling,[12] which held, con-

sistent the March 29th Ruling (at 4–6), FED. R.EVID. 412(a)(1), 412(a)(2) & 412(b)(1)(B), and *Blackmon v. Buckner,* 932 F.Supp. 1126 (S.D.Ind.1996),[13] that defendants would be permitted to cross-examine plaintiff on the extent to which, if at all, plaintiff somehow seduced or encouraged Mr. D prior to the alleged rape, but would not be allowed to cross-examine him on any homosexual encounters he may have had at Somers after October 1991; the Court did not permit any cross-examination on the issue of venereal disease, in that plaintiff had withdrawn any claim regarding sexually transmitted diseases. Therefore, Exh. T was marked as a full exhibit, except for a two-page report, dated June 24, 1991, which was marked as Exh. T1 for identification purposes only. *See also* lengthy 5/4/99 margin endorsement on Dkt. # 208 (regarding testimony of Dr. Blanchette).

As previously indicated in Section I.B.3 *supra,* immediately prior to the jury charge, in Attorney Dignam's apology, she ."remind[ed the jury] ... that plaintiff makes no claim in this case that he contracted a sexually-transmitted disease from Mr. D. To the extent that comments by counsel may be interpreted to suggest otherwise, you should ignore them. You must ignore them." (5/7/99 Tr. at 120).

Contrary to defendants' argument, the Court's rulings did not "deprive[ ] defendants of their fundamental right to defend themselves" and it is sheer speculation to conclude that "[h]ad this highly probative evidence been admitted, the jury never would have found for plaintiff as to liability." (Dkt. # 250, at 11). The April 27, 1999 oral ruling and the May 4, 1999 margin endorsement regarding evidence of plaintiff's sexual history were consistent with Rule 412, the *Blackmon* decision, and the issues in the case.

---

**11.** Defendants have filed this motion in anticipation of plaintiff's motion for attorney's fees. (*Id.* at 2).

**12.** This ruling was not included in the 4/27/99 transcript.

**13.** In *Blackmon,* the plaintiff-inmate asserted an Eighth Amendment claim that the defendants-jail officials acted with deliberate indifference with respect to plaintiff's rape by several other inmates in November 1992. Under Rule 412(b), the district court refused to permit defendants to introduce evidence of plaintiff's homosexual activities prior to his entering jail, and similarly did

not permit defendants to introduce evidence of plaintiff's homosexual activities at the state correctional facilities after his 1993 conviction, holding: "This evidence is obviously irrelevant and does not satisfy the more stringent standard of Rule 412(b)(2)." *Id.* at 1128.

The district court, however, ruled that to the extent plaintiff sought to put in evidence that he was a "mark" or "target" for sexual taunting and harassment, defendants would be permitted to introduce evidence that plaintiff had sexually "teased" other jail inmates. *Id.* at 1128–29.

The admissibility of evidence regarding subsequent remedial measures was discussed in the lengthy 5/4/99 margin endorsement on Dkt. #221 and the discussion therein is incorporated by reference here.

### 3. JURY CHARGE ON SUPERVISORY LIABILITY

The November 5th Ruling observed, regarding supervisory liability:

> A defendant may be personally involved in a constitutional deprivation within the meaning of 42 U.S.C. § 1983 in several ways. The defendant may have directly participated in the infraction. A supervisory official, after learning of the violation through a report or appeal, may have failed to remedy the wrong. A supervisory official may be liable because he or she created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue. Lastly, a supervisory official may be personally liable if he or she was grossly negligent in managing subordinates who caused the unlawful condition or event.

1998 WL 849393, at *5 (*quoting Williams v. Smith*, 781 F.2d 319, 323–24 (2d Cir.1986) (multiple citations omitted)). The one-paragraph jury charge on supervisory liability was consistent with the *Williams* decision (Court Exh. 1, at 29–30), to which defense counsel took an exception. (5/7/99 Tr. at 155). It was appropriate to have given this charge, because a reasonable jury could have found that defendants created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue.

### 4. JURY INTERROGATORIES AND VERDICT FORM REGARDING QUALIFIED IMMUNITY

This issue already was addressed in Section I.D.2 *supra* and need not be repeated here.

### 5. WRONG LEGAL STANDARD FOR FAILURE TO PROTECT AND RELEASE FROM SEGREGATION

Defendants argue that in the jury charge, the Court should have applied the legal standard in *Page v. Manson,* and not under *Farmer v. Brennan.* Defense counsel took an exception to this portion of the jury charge. (5/7/99 Tr. at 154). The issue was extensively discussed in the November 5th Ruling, which is incorporated by reference here. *See also* Sections I.B.2 & I.D.2 *supra.*

## II. CONCLUSION

Accordingly, for the reasons stated above, defendants' Motion for Mistrial (Dkt. #230), defendants' Renewed Motion for Judgment After Trial, Or, In The Alternative For A New Trial (Dkt. #239), plaintiff's Motion For A New Trial With Respect to Damages Only (Dkt. #243), defendants' Motion for Judgment As A Matter of Law (JMOL) After Trial (Dkt. #245), and defendants' Motion for New Trial And/Or To Alter Or Amend Judgment (Dkt. #246) are all *denied.*